1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9         FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ANTHONY MARVELL SEMIEN,

11          Petitioner,              No. CIV S-09-CV-1912 GEB CHS P

12      vs.

13   FRANCISCO JACQUEZ,

14          Respondent.           FINDINGS AND RECOMMENDATIONS

15   _____/

16                      **I.  INTRODUCTION**

17          Petitioner, Anthony Marvell Semien, is a state prisoner proceeding pro se with a

18   petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a

19   cumulative sentence of life eighty-seven years to life with the possibility of parole following his

20   2006 jury convictions for evading a police officer with reckless driving, threatening injury to an

21   officer, resisting an officer, and threatening to commit a crime resulting in death or great bodily

22   injury, with penalty enhancements for prior convictions and prior prison terms.  Here, Petitioner

23   challenges the constitutionality of his convictions.

24                       **II.  CLAIMS**

25          Petitioner presents several grounds for relief.  Specifically, the claims are as follow:

26          (1)     Trial counsel rendered prejudicially ineffective assistance.

1

(2) The trial court unlawfully permitted the prosecutor to amend the information several weeks before the commencement of trial to add a charge that was not included in the original complaint.

(3) Appellate counsel rendered prejudicially ineffective assistance.

(4) The prosecutor exercised a peremptory challenge against an African-American juror based upon racial bias, in violation of his rights under *Batson v. Kentucky*, 476 U.S. 79 (1986) and *People v. Wheeler*, 22 Cal.3d 148 (1978).

Am. Pet. at 4-6.

Petitioner's ineffective assistance of trial and appellate counsel claims, set forth in his first and third grounds for relief, will be addressed cumulatively in section (V)(A), below. To the extent, however, that Petitioner's ineffective assistance of trial counsel claim also encompasses a challenge to the trial court's denial of his August 9, 2006 motion to substitute counsel, made pursuant to *People v. Marsden*, 2 Cal.3d 118 (1970)[1], that claim will be discussed separately in section (V)(B). Petitioner's claims alleging improper amendment of the information and use of peremptory challenges, set forth in his second and third and fourth grounds for relief , will be considered in sections (V)(C) and (V)(D), respectively. After careful consideration of the record and the applicable law, it is recommended that each of Petitioner's claims be denied..

## III. BACKGROUND

### A. FACTS

The basic facts of Petitioner's crime were summarized in the published opinion of the California Court of Appeal, Third Appellate District, as follow:

> On February 16, 2006, at 1:18 a.m., two California Highway Patrol (CHP) officers traveling in a marked patrol car on Interstate 80 did a random check on a white Acura and learned its registration had expired, though the car bore a current registration tag. The officers tried to pull the car over, but the Acura sped up, exited the highway,

[1] In a *Marsden* motion, a criminal defendant in California requests that the court discharge his current counsel and appoint new counsel.

crossed the median, reentered the highway going the opposite direction, and sped up to 100 miles per hour. The Acura exited at Truxel Road, ran a red light, made turns and drove over speed bumps at 50 miles per hour, ran a stop sign, spun out of control, and came to rest on a sidewalk.

Defendant got out of the car and ran, but the officers chased him down and placed him in handcuffs.

Defendant was agitated, yelled obscenities, kicked, and tried to pull away. He said he was going to put up a fight, the officers were "going to kill him tonight." At the patrol car, defendant suddenly slammed his head into the trunk. The officers tried to apply leg restraints, but defendant threatened to kill one of the officers. The officers applied pepper spray to defendant's face in order to secure the leg restraints. They then flushed his eyes with water and took him to the hospital. Defendant tried to spit on the officers and continued to threaten them. At the jail, defendant continued his uncooperative and threatening behavior.

An open bottle of alcohol was found in the Acura, and the passenger smelled of alcohol; defendant was not charged with driving under the influence.

The jury found the defendant guilty on Counts One, Two, Three, and Six (evading a police officer with reckless driving; threatening injury to an officer; resisting an officer; and threats to commit a crime resulting in death or great bodily injury). The jury found defendant not guilty as to Count Four (vandalism) and deadlocked on Count Five (threat of injury to an officer), resulting in a mistrial on Count Five.

In a bifurcated trial, the jury found true the prior conviction and prior prison term allegations.[2]

The trial court sentenced defendant to prison for 87 years (25 years to life on Count One; consecutive terms of 25 years to life on Counts Two and Six; 25 years on Count Three, stayed under section 654; plus 12 years on the enhancement allegations).

*People v. Semien*, 162 Cal.App.4th 701, 704-705 (2008).

Petitioner appealed his convictions to the California Court of Appeal, Third Appellate

---

[2] In California, trials may be bifurcated for the purpose of determining a criminal defendant's guilt with regard to charged offenses separately from the truth of prior conviction and prior prison term allegations.

3

District.  The appellate court affirmed his convictions with a reasoned opinion on April 30, 2008.

The California Supreme Court denied his petition for review of the appellate court's decision

without comment on July 23, 2008.  After exhausting the appellate process, Petitioner sought habeas

corpus relief in the Yolo County Superior Court.  His petition was denied with a brief opinion on

May 28, 2008.  Petitioner subsequently filed habeas corpus petitions in the California Court of

Appeal, Third Appellate District, and the California Supreme Court.  Those petitions were denied

without comment on February 19, 2009 and August 26, 2009, respectively.

Petitioner filed this federal petition for writ of habeas corpus on July 6, 2009.  The

action was subsequently stayed at Petitioner's request because several of the grounds alleged in his

petition were still pending before the California Supreme Court.  Following exhaustion of his claims

in state court, the stay was lifted and Petitioner was granted leave to amend his petition.  The

amended petition was filed on November 6, 2009.[3]  Respondent filed an answer on July 28, 2010,

and Petitioner filed his traverse on August 27, 2010.

### IV.  APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

This case is governed by the provisions of the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after

its enactment on April 24, 1996.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114

F.3d 1484, 1499 (9th Cir. 1997).  Under AEDPA, an application for a writ of habeas corpus by a

person in custody under a judgment of a state court may be granted only for violations of the

---

[3] On November 30, 2009, Petitioner filed several documents duplicating those filed on
November 6, 2009, including a Motion to Lift Stay, a Motion to Amend Petition for Writ of Habeas
Corpus, an Amended Petition for Writ of Habeas Corpus, and Exhibits in Support of the Amended
Petition.  *Semien v. Jacquez*, No. 09-1912 (E.D.Cal. Nov. 30, 2009), E.C.F. Nos. 10-15, 17, and 18.
On November 30, 2009, Petitioner also filed a Declaration in which he acknowledged that the
Amended Petition filed on November 30, 2009, E.C.F. No. 14, was identical to the first amended
petition filed on November 6, 2009, E.C.F. No. 12, absent some attachments which Petitioner
described as only mildly important.  In the Declaration, Petitioner also explained that he filed the
November 30, 2009 amended petition due to his concern that the November 6, 2009 petition had not
been received by the court, and instructed the court to disregard the November 30, 2009 amended
petition if the November 6, 2009 amended petition had been received and filed, which it had.  E.C.F.
No. 19 at 1-2.

Constitution or laws of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 n. 7 (2000).  Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

 28 U.S.C. § 2254(d).  Although "AEDPA does not require a federal habeas court to adopt any one methodology," there are certain principles which guide its application.  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)

First, AEDPA establishes a "highly deferential standard for evaluating state-court rulings."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  Accordingly, when determining whether the law applied to a particular claim by a state court was contrary to or an unreasonable application of "clearly established federal law," a federal court must review the last reasoned state court decision.  *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004); Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Provided that the state court adjudicated petitioner's claims on the merits, its decision is entitled to deference, no matter how brief.  *Lockyer*, 538 U.S. at 76; *Downs v. Hoyt*, 232 F.3d 1031, 1035 (9th Cir. 2000).  Conversely, when it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, AEDPA's deferential standard does not apply and a federal court must review the claim de novo.  *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

Second, "AEDPA's, 'clearly established Federal law' requirement limits the area of law on which a habeas court may rely to those constitutional principles enunciated in U.S. Supreme Court decisions."  *Robinson*, 360 F.3d at 155-56 (citing *Williams*, 529 U.S. at 381).  In other words, "clearly established Federal law" will be " the governing legal principle or principles set forth by [the U.S. Supreme] Court at the time a state court renders its decision."  *Lockyer*, 538 U.S. at 64.

1 It is appropriate, however, to examine lower court decisions when determining what law has been

2 "clearly established" by the Supreme Court and the reasonableness of a particular application of that

3 law.  *See Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000).

4         Third, the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have

5 "independent meanings." *Bell v. Cone*, 535 U.S. 685, 694 (2002).  Under the "contrary to" clause,

6 a federal court may grant a writ of habeas corpus only if the state court arrives at a conclusion

7 opposite to that reached by the Supreme Court on a question of law, or if the state court decides the

8 case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*,

9 529 U.S. at 405.  It is not necessary for the state court to cite or even to be aware of the controlling

10 federal authorities "so long as neither the reasoning nor the result of the state-court decision

11 contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).  Moreover, a state court opinion need not

12 contain "a formulary statement" of federal law, but the fair import of its conclusion must be

13 consistent with federal law. *Id*.

14         Under the "unreasonable application" clause, the court may grant relief "if the state

15 court correctly identifies the governing legal principle...but unreasonably applies it to the facts of

16 the particular case." *Bell*, 535 U.S. at 694.  As the Supreme Court has emphasized, a court may not

17 issue the writ "simply because that court concludes in its independent judgment that the relevant

18 state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*,

19 529 U.S. at 410.  Thus, the focus is on "whether the state court's application of clearly established

20 federal law is *objectively* unreasonable." *Bell*, 535 U.S. at 694 (emphasis added).

21         Finally, the petitioner bears the burden of demonstrating that the state court's

22 decision was either contrary to or an unreasonable application of federal law. *Woodford*, 537 U.S.

23 at 24 ; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

## V. DISCUSSION

24

25 **A.**     **Effective Assistance of Counsel**

26       **1.**     **Trial Counsel**

1    Petitioner claims that he was denied the effective assistance of trial counsel in

2  several ways.[4]  Specifically, Petitioner contends that counsel, Chief Deputy Public Defender for

3  Yolo County, Jessie Morris, Jr., failed to (a) cross-examine a witness at the preliminary hearing; (b)

4  subpoena a witness, Charlie Sparks, to testify on his behalf; and (c) object or move for dismissal,

5  mistrial, or a new trial on the grounds that the charges and instructions read to the jury did not

6  include the names of the victims.

7    The Sixth Amendment to the United States Constitution guarantees to a criminal

8  defendant the effective assistance of counsel.  A showing of ineffective assistance of counsel has

9  two components.  *See Strickland v. Washington*, 466 U.S. 668 (1984).  First, a petitioner must

10  demonstrate that, considering all the circumstances, counsel's performance fell below an objective

11  standard of reasonableness.  *Id.* at 687-88.  In assessing an ineffective assistance of counsel claim,

12  "[t]here is a strong presumption that counsel's performance falls within the 'wide range of

13  professional assistance,'" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (quoting *Strickland*,

14  466 U.S. at 689), and that counsel "exercised acceptable professional judgment in all significant

15  decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (citing *Strickland*, 466 U.S.

16  at 689).  As the United States Supreme Court recently emphasized, the question for a federal court

17  conducting habeas corpus review under section 2254(d)  "is not whether counsel's actions were

18  reasonable."  *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011). "The standards created by

19  *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review

20  is 'doubly' so."  *Id*. (internal quotations and citations omitted).  The determination to be made,

21  therefore, is not whether counsel acted reasonably, but "whether there is any reasonable argument

22  that counsel satisfied *Strickland's* deferential standard." *Id*.

23    The second factor required for a showing of ineffective assistance of counsel is actual

24

25    [4] In his petition, Petitioner also claims that counsel rendered ineffective assistance when the
   trial court denied his motion to dismiss for lack of prosecution, which interfered with his right to a

26  speedy trial.  In his traverse, however, Petitioner admits that this claim would not entitle him to
   habeas corpus relief and abandons the claim as moot.  Thus, it is not addressed herein.

prejudice caused by the deficient performance. *Strickland*, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id. See also Williams v. Taylor*, 529 U.S. 362, 391-92 (2000); *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000). Importantly, on collateral review, a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Pizzuto v. Arave*, 280 F.3d 949, 955 (9th Cir. 2002) (citing *Strickland*, 466 U.S. at 697).

### a.   Failure to Cross Examine a Witness at the Preliminary Hearing

Petitioner claims that trial counsel rendered prejudicially ineffective assistance during his preliminary hearing by failing to cross examine prosecution witness Rafael Vicente, a former deputy sheriff with the Yolo County Sheriff's Department. Petitioner argues that Deputy Vicente's testimony was the only evidence linking him to an allegation that he threatened to commit a crime resulting in death and great bodily injury to another person, in violation of section 422 of the California Penal Code. Petitioner further argues that defense counsel should have cross examined Deputy Vincente for impeachment purposes because the deputy's testimony was not based upon his own first-hand observations and was therefore unreliable.

At the preliminary hearing, which took place on May 17 and May 18, 2006, the prosecutor presented two witnesses who testified regarding their observations of the attempt by law enforcement officers to conduct a traffic stop on an Acura sedan ("the Acura"), the ensuing car chase, Petitioner's attempt to evade arrest by fleeing from the Acura on foot, and the agitated, threatening, and uncooperative behavior exhibited by Petitioner while he was being placed under arrest. Following the testimony of the two witnesses, the prosecutor stated that she had one remaining witness who would testify in support of a count not yet charged. This remaining witness,

1  Deputy Vicente, would provide testimony regarding threats made by Petitioner against a correctional

2  officer while during his booking at the Monroe Detention Center following his arrest. The deputy's

3  testimony would support an additional count alleging another violation of section 422 of the

4  California Penal Code.

5        Defense counsel objected on the grounds that Petitioner had not received adequate

6  notice, as required by the due process clause, of the additional charge and Deputy Vicente's

7  testimony. The prosecutor responded that discovery had been provided to the defense in advance

8  of the preliminary hearing. This discovery included information regarding Petitioner's behavior at

9  the detention center, and the prosecutor indicated that the Deputy Vicente's testimony would not

10 exceed the bounds of discovery. The court continued the preliminary hearing until the following

11 day in order to allow the prosecutor an opportunity to determine why the count had not been charged

12 in the original complaint, as well as to allow defense counsel additional time to prepare for the

13 deputy's testimony.

14        At the continued preliminary hearing the following day, defense counsel renewed his

15 objection to Deputy Vicente's testimony and to the addition of the uncharged count. The prosecutor

16 explained that the count would have been charged in the original complaint, however the prosecutor

17 who filed that complaint was not yet in possession of Deputy Vicente's official report at the time

18 of filing. The prosecutor did not request leave to amend the complaint, but instead wished to present

19 the evidence so that the count could be included in the information if the court found sufficient

20 evidence to issue a holding order. The prosecutor noted that, in any event, section 1009 of the

21 California Penal Code provided that a complaint could be amended at any stage of the proceedings

22 with leave of the court, so long as it was supported by evidence taken at the preliminary hearing

23        The court determined that the Deputy Vicente's testimony was admissible because

24 it was transactionally related to counts already charged. In addition, the court reasoned that defense

25 counsel had sufficient notice of the proposed testimony and the related uncharged count because he

26 was in possession of Deputy Vicente's official report well in advance of the preliminary hearing and

that counsel had been given an additional twenty-four hours to prepare for the testimony. The court also noted that requiring the prosecutor to file the additional count separately was not an efficient use of judicial resources because it could ultimately be consolidated for trial purposes as it was transactionally related to the counts already charged.

Following the court's ruling, Deputy Vicente testified on direct examination that, on the date of Petitioner's arrest, he was dispatched to the Monroe Detention Center in Yolo County in response to a report that an inmate was threatening a correctional officer. Upon arriving at the detention center, he spoke with three correctional officers. One of the officers told Deputy Vicente that he had been personally threatened by Petitioner while removing him from a cell for in order to complete booking him. The other two officers stated that they witnessed Petitioner threatening the first officer. Deputy Vicente clearly testified on direct examination that he was not present when the threats occurred and his knowledge of the threats derived from the information conveyed to him by the three officers from whom he obtained statements. When given the opportunity to cross examine Deputy Vicente, the following exchange took place between defense counsel and the court:

THE COURT:      Mr. Morris?

MR. MORRIS:     I renew my objections that I made previously to this witness' testimony. I choose not, at this time, to ask any questions.

And let me indicate that I do that so that I preserve any objections that I make, and I don't wish the nature of any preparation or lack of preparation to enter into the issue of whether the decision that the Court has made with respect to allowing this witness to testify be part of the issue of whether the decision the Court has made with respect to allowing this witness to testify be part of the issues I raise later.

And so all I'm saying is that I choose at this point not to ask questions of this witness.

10

| | |
|---|---|
| THE COURT: | Are you saying you are unprepared to question him? |
| MR. MORRIS: | I'm saying I choose not to ask any questions. |
| THE COURT: | You are not unprepared? |
| MR. MORRIS: | I choose not to ask questions. |
| THE COURT: | Okay. I'm asking you a question, and I want an answer: Are you unprepared to ask him questions? |
| MR. MORRIS: | I'll answer it this way: There are times that my client is cooperative with me and there are times that he is not, and the quality of my preparation is such that it involves attorney-client privilege. |
| | And based upon that, I believe I do not have to respond to the Court's question and claim the privilege. |
| THE COURT: | You have not said you are unprepared, and that's the answer I am going to take from your comments. |

CT at 63-64. Following the preliminary hearing, the court found sufficient evidence to hold Petitioner over on Counts One, Two, Three, Four, and Six as alleged in the First Amended Complaint filed on February 27, 2006. He was also held over on Count Five, but it was reduced from a felony to a misdemeanor. The court found insufficient evidence to hold Petitioner over on Count Seven; consequently he was also not held to answer on the Count Seven (a) enhancement. Lastly, the court found sufficient evidence to issue a holding order as to the initially uncharged count based on the testimony of Deputy Vicente.

With respect to his current claim for federal habeas corpus relief, Petitioner has failed to overcome the strong presumption that trial counsel "exercised acceptable professional judgment" by declining to cross examine Deputy Vicente at the preliminary hearing. *See Hughes*, 898 F.2d at 702. As the preliminary hearing transcript reflects, counsel clearly explained that he was exercising

11

a choice not to cross examine the deputy, but he nonetheless wished to preserve his objections to the deputy's testimony.  Counsel further explained that Petitioner's cooperation with him regarding the preparation of his own defense could be described as inconsistent, at best,[5] and that counsel's decision not to cross examine Deputy Vicente, at least in part, was based on information protected by the attorney-client privilege.   On this record, it appears that counsel exercised objectively reasonable professional judgment under the circumstances.   A reasonable tactical decision by counsel with which Petitioner disagrees cannot form the basis of an ineffective assistance of counsel claim.  *Strickland*, 466 U.S. at 689.  Petitioner has thus failed to demonstrate that counsel's failure to cross examine Deputy Vicente at the preliminary hearing constituted deficient performance.

Even assuming that counsel's failure to cross-examine Deputy Vicente fell below an objective standard of reasonableness, Petitioner also fails to demonstrate prejudice.  Put another way, Petitioner has not established that the result of the preliminary proceedings would have been different had counsel elected to cross examine Deputy Vicente.  Petitioner claims that counsel should have cross examined the deputy in order to demonstrate that his testimony was unreliable because it was based on hearsay.  Deputy Vicente clearly testified on direct examination, however, that he did not personally witness Petitioner threaten a correctional officer at Monroe Detention Center and that his testimony was based upon descriptions of the incident as reported to him by other officers.  CT at 62.  Any cross examination of the deputy regarding his personal knowledge of threats made by Petitioner while he was being booked at Monroe Detention Center, therefore, would

---

[5] Importantly, the record as a whole is replete with evidence that Petitioner was extremely disruptive throughout both pre-trial proceedings and the trial itself, to the point where he was removed from the courtroom on multiple occasions.  It is obvious that his behavior towards both the court and counsel was uncooperative, that he refused to communicate with counsel, and that he continually misrepresented counsel's efforts on his behalf to the court in an apparent effort to obtain new counsel and/or stall the trial proceedings.  One of many examples of Petitioner's poor behavior and attitude occurred at a pre-trial hearing on a defense motion to dismiss where Petitioner was removed from the courtroom for disruptive behavior.  At that point, counsel explained to the court on the record the difficulties he had encountered while representing Petitioner.  *See* RT at 30-31.  Petitioner's relationship with counsel is more fully described below in subsection (V)(B), which examines his *Marsden* claim.

merely have been cumulative of testimony already presented by the deputy during direct examination.

Moreover, in California, the purpose of a preliminary hearing is to "establish whether there exists probable cause to believe that the defendant has committed a felony."  CAL. PENAL CODE § 866(b).  The "probable cause determination may be based entirely on hearsay statements related by a police officer with certain qualifications and experience."  *Whitman v. Superior Court*, 54 Cal.3d 1063, 1070 (1991).  Petitioner does not now claim that Deputy Vicente lacked the qualifications or experience required to permit him to offer testimony based on hearsay statements at the preliminary hearing.  Thus, it was not improper for the trial court to consider Deputy Vicente's hearsay based testimony in making its determination of whether probable cause existed to believe Petitioner had committed an additional violation of section 422 of the California Penal Code.  There is no reasonable probability that the results of Petitioner's preliminary hearing would have been different if trial counsel had impeached Deputy Vicente in the manner now suggested by Petitioner.

Petitioner is not entitled to federal habeas corpus relief on this claim.

### b.    Failure to Subpoena Charles Sparks to Testify at Trial

Petitioner claims that trial counsel rendered prejudicially ineffective assistance by failing to subpoena Charles Sparks to testify at trial.  Petitioner argues that no witness at trial could identify him as the driver of the Acura.  According to Petitioner, Mr. Sparks would have testified that he, not Petitioner, was the Acura's driver.  Petitioner argues that absent testimony from Mr. Sparks, the jury could only conclude that Petitioner must have been the Acura's sole occupant and the driver who fled from the police.  Petitioner contends had Mr. Sparks testified, the prosecution would not have been able to prove an essential element of the offence, that he was driving a motor vehicle and "willfully fled from, or tried to elude" a peace officer and, consequently, the jury would not have been able to find him guilty beyond a reasonable doubt of the offense charged in count one, evading a peace officer.  CT at 335.

Petitioner's contention that no witness could identify him as the driver of the fleeing

13

Acura does not accurately reflect the trial testimony of multiple law enforcement officers who did, in fact, identify Petitioner as the Acura's driver.  Petitioner also misstates trial testimony regarding the existence of a passenger in the Acura.

California Highway Patrol Officers Darrell Nishimi and David Diaz, the officers who attempted to conduct the initial traffic stop both testified at trial.  The two officers were partners; Officer Diaz was driving the patrol vehicle and Officer Nishimi was the passenger.  Officer Nishimi testified that when the pursuit began, he could not tell how many people were inside of the Acura.  However, after the chase concluded, he observed Petitioner exit from the driver's side of the vehicle, run down the sidewalk, and attempt to climb over a fence.  Officer Nishimi exited the patrol vehicle to pursue Petitioner.  He ordered Petitioner to stop running and attempted to pull him off of the fence.  Instead of stopping, Petitioner spun out of Officer Nishimi's grasp and ran North.  Officer Nishimi testified that both he and Officer Diaz ran after Petitioner and eventually both officers succeeded, with the help of another officer, apprehending Petitioner and handcuffing him, despite Petitioner's struggle to resist arrest and his failure to cooperate with the officers.  At some point following the struggle, Officer Nishimi made contact with the passenger of the Acura, who identified himself as Charles Wright, a cousin of Petitioner.  Officer Nishimi did not suspect the passenger of any wrongdoing at the time, however he later came to believe that the passenger had falsely identified himself.

Similarly, Officer Diaz testified that when the Acura came to a stop, he pulled the patrol vehicle behind and offset to the left of the Acura.  Officer Diaz testified that Petitioner was the driver and that he also observed him running away from the vehicle and attempting to jump over a fence.  Officer Diaz observed Officer Nishimi run after Petitioner and attempt to pull him off of the fence.  When Petitioner spun out of Officer Nishimi's grasp, both officers pursued him.  Officer Diaz testified that after Petitioner was handcuffed, he and several other officers made contact with the Acura's passenger.  Officer Diaz heard the passenger give identifying information to another officer, however he never independently verified the passenger's identification.

14

California Highway Patrol Officer Vaughn Parsons testified that, on the night of the incident in question ,he was working a traffic control detail near the location where the chase concluded.  He heard over his radio that a pursuit was taking place and proceeded to Truxel Road, where he encountered Officer Nishimi and Officer Diaz struggling with Petitioner.  After assisting the other officers to apprehend Petitioner, Officer Parsons testified that he made contact with the Acura's passenger.  To Officer Parsons' knowledge, the passenger had committed no wrongdoing that evening that would require police attention.  Charles Wright, Petitioner's cousin, appeared by subpoena at trial for identification purposes before Officer Nishimi and Officer Diaz.  Neither officer believed Mr. Wright to be the passenger in Petitioner's Acura on the night in question.

The crux of Petitioner's current ineffective assistance of counsel claim rests on counsel's failure to call Charles Sparks to testify at trial following being informed by Petitioner that he was the Acura's other occupant and the person who identified himself to the highway patrol officers as Charles Wright.  At the a hearing conducted on August 9, 2006 hearing Petitioner's counsel explained his investigation with respect to Charles Sparks' potential usefulness as a witness and his ultimate determination that Mr. Sparks would not provide testimony beneficial to Petitioner's defense.  RT at 115-119.  Because Petitioner claimed that Mr. Sparks was actually driving the Acura, counsel sent an investigator to speak with him.  According to Mr. Sparks, he was intoxicated and asleep in the backseat of Petitioner's car during the chase.  Following Petitioner's arrest, Mr. Sparks was placed into a taxi by police officers and sent home.  Mr. Sparks denied being the driver.  Based on Mr. Sparks statements to the investigator, counsel made the decision not to subpoena Mr. Sparks for trial, in part because if Petitioner chose to testify, his claim that Mr. Sparks was the driver would directly conflict with Mr. Sparks' claim to have been asleep in the backseat of the Acura during the chase.  In addition, Mr. Sparks' statement to the investigator was consistent with Highway Patrol reports that Petitioner drove the Acrua.  Counsel also spoke to several of Petitioner's family members who believed that Mr. Sparks was not the driver.  Moreover, Petitioner expressed to counsel that he did not want to get Mr. Sparks in trouble for any reason.

15

Petitioner's ineffective assistance claim as it relates to counsel's failure to summon Mr. Sparks as a witness is without merit because Petitioner has failed to demonstrate that counsel's decision not to summon Mr. Sparks as a witness fell below an objective standard of reasonably competent performance. The record indicates that counsel conducted investigation regarding Mr. Sparks' potential value as a witness in Petitioner's case and determined that he would not testify in a manner consistent with Petitioner's claim that he was the actual driver of the Acura. To the contrary, it appears that Mr. Sparks claimed that he was merely a passenger in the car driven by Petitioner, which is consistent with the testimony provided by the officer witnesses. Once again, a reasonable tactical decision by counsel with which Petitioner disagrees cannot form the basis of an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 689. Under these circumstances, it is reasonable to find that counsel satisfied *Strickland's* highly deferential standard. *Harrington*, 131 S.Ct. at 778.

Moreover, Petitioner's conclusory allegation that Mr. Sparks would have provided favorable trial testimony is insufficient to demonstrate that trial counsel was ineffective. *See Bragg v. Galaza*, 242 F.3d 1082, 1088  (9th Cir. 2001) (no ineffective assistance where the petitioner did "nothing more than speculate that, if interviewed," a witness might have given helpful information); *United States v. Harden,* 846 F.2d 1229, 1231-32 (9th Cir. 1988) (no ineffective assistance because of counsel's failure to call a witness where, among other things, there was no evidence in the record that the witness would, in fact, testify).  The burden of demonstrating ineffective assistance of counsel cannot be met without showing that the proposed witness, Mr. Sparks, would be willing to testify.  This burden may be established by providing the court with an affidavit from Mr. Sparks detailing what his testimony would have been.  *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (no ineffective assistance where there was no evidence in the record that a helpful witness actually existed and the petitioner failed to present an affidavit establishing that the alleged witness would have provided helpful testimony for the defense).  Petitioner has supplied no such affidavit in this case and, as noted above, the record indicates that, if anything, Mr. Sparks would have provided

16

testimony in conflict with the defense Petitioner wished to present. Speculation by Petitioner that Mr. Sparks would have testified or that his testimony would have been helpful at trial is insufficient to demonstrate prejudice. *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001).

Petitioner is not entitled to federal habeas corpus relief on this claim.

### c.    Failure to Object to Jury Instructions

Petitioner claims that trial counsel rendered prejudicially ineffective assistance by failing to object to the jury instructions, which Petitioner argues were ambiguous because they did not specify the victims' names as to Counts Two, Three, Five, and Six. Consequently, Petitioner argues, the state was unable to prove each element of the charged offenses beyond a reasonable doubt. Petitioner contends that counsel's failure to object to the jury instructions or to move for dismissal, mistrial, or a new trial fell below an objective standard of reasonableness and that he was prejudiced by counsel's performance because he should have been acquitted on those charges, rather than convicted.

Petitioner's claim is based, at least in part, on factually incorrect assertions. A review of the record demonstrates that the names of the victims were, in fact, articulated by the trial court while instructing the jury both at the beginning of trial and prior to jury deliberation. Specifically, prior to opening statements by counsel, the court instructed the jury as follows:

THE COURT:    Counts 2 and 5, on or about - - there are two separate charges, ladies and gentleman - - on or about February 16, 2006, Anthony Marvell Semien did commit a felony, namely, a violation of Section 71(1) of the California Penal Code, threat of injury made to [an] officer in performance of [his] duties, in that Anthony Marvell Semien, with intent to cause, did willfully and unlawfully attempt to cause and did cause an officer or employee of any public or private educational institution or a public officer or employee to do or refrain from doing an act in the performance of said person's duties by means of a threat directly communicated to such person, to wit, Officer D.N. and Officer D.D., to inflict an unlawful injury upon any person or property and it

reasonably appeared to the recipient of the threat that such threat could be carried out.

Count 3, on or about February 16th, 2006, Anthony Marvell Semien did commit a felony, namely, a violation of Section 69 of the California Penal Code, resisting [an] executive officer by means of threats, force, or violence, in that Anthony Marvell Semien did willfully and unlawfully attempt, by means of threats and violence, to deter or prevent an executive officer, to wit, Officer D.N., from performing a duty imposed upon such officer by law and did willfully, unlawfully and knowingly resist by the use of force or violence and such officer in the performance of said officer's duties.

. . . .

Count 6, on or about February 16, 2006, Anthony Marvell Semien did commit a felony, namely, a violation of Section 422 of the California Penal Code, threats to commit crime resulting in death or great bodily injury, in that Anthony Marvell Semien did willfully and unlawfully threaten to commit a crime which will result in death and great bodily injury to another person, to wit, C.L., with the specific intent that the statement is to be taken as a threat even if there is no intent of actually carrying the threat out, which threat, when taken on its face and under the circumstances in which it is made is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat and thereby cause that person reasonably to be in sustained fear for his or her safety and for his or her immediate family's safety.

RT at 168-170. In addition, the victims were named by the court in the jury instructions given prior to closing argument. The relevant portion of the instructions is as follows:

[THE COURT]:        In Count 2, the alleged victim is identified by the initials D.N. That would be Officer Nishimi. And in Count 5, the alleged victim is identified by the initials D.D. That would be Officer Diaz who's alleged to have been

18

the victim in that case.

. . . .

The People have the burden of proving beyond a reasonable doubt that Darrell Nishimi and Dave Diaz were each performing their duties as a peace officer. If the People have not met this burden, you must find the defendant is not guilty of Counts 2, 3 and 5 .

. . .

The defendant is charged in Count 6 with having made a criminal threat. To prove that the defendant is guilty of this crime, the people must prove: one, the defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to Calvin Losh . . . .

RT at 478-485. Petitioner is thus mistaken when he claims that the jury instructions did not specify the victims' names.

In any event, even had the jury instructions not specified the victims' names as to each of Counts 2, 3, 5, and 6, all of which alleged crimes against a person, there is no reasonable probability that the outcome of Petitioner's trial would have been different had counsel objected or moved for a dismissal of the charges, a mistrial or a new trial on those grounds. Moreover, on the record in this case, there is no reasonable probability that the jury instructions, as given, confused the jurors regarding the prosecution's burden to prove each element of each alleged count beyond a reasonable doubt or that it was unclear to the jurors that Officer Nishimi, Officer Diaz, and Officer Losh were alleged to be the victims of Counts 2, 3, 5, and 6. Indeed, substantial evidence was presented at trial, including the testimony of those three alleged victims, which supported the jury's guilty verdicts. Thus, even assuming arguendo that counsel's conduct fell below an objective standard of reasonableness, Petitioner has failed to demonstrate that he suffered any prejudice as a result.

Petitioner is not entitled to federal habeas corpus relief on this claim.

**2.    Appellate Counsel**

19

1   Petitioner claims that counsel rendered prejudicially ineffective assistance by failing

2   to raise the following issues on appeal: (a) the trial court violated Petitioner's constitutional rights

3   by imposing consecutive sentences for his multiple convictions; (b) the jury instructions failed to

4   specify by name the alleged victims; (c) any of the seven appealable issues identified in the notice

5   of appeal filed by trial counsel.  In addition, Petitioner claims that appellate counsel's performance

6   fell below objectively reasonable standards because she (d) failed to augment the appellate record

7   with the transcript of his May 16, 2006 *Marsden* hearing until June 9, 2008,[6] after the appellate court

8   had already affirmed his convictions; and (e) did not timely file a reply brief on appeal.

9   The *Strickland* standards discussed above apply to appellate counsel as well as trial

10  counsel.  *Smith v. Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th

11  Cir. 1989).  An indigent defendant "does not have a constitutional right to compel appointed counsel

12  to press nonfrivolous points requested by the client if counsel, as a matter of professional judgment,

13  decides not to present those points."  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).[7]  "Counsel must

14  be allowed to decide what issues are to be pressed."  *Id*.  Otherwise, the ability of counsel to present

15  the client's case in accord with counsel's professional evaluation would be "seriously undermined."

16  *Id*.  *See also Smith v. Stewart,* 140 F.3d 1263, 1274 n.4 (9th Cir. 1998) (counsel was not required

17  to file "kitchen-sink briefs" because it "is not necessary, and it is not even particularly good

18  appellate advocacy.").  There is, of course, no obligation to raise meritless arguments on a client's

19  behalf.  *See Strickland*, 466 U.S. at 687-88 (requiring a showing of deficient performance as well

20  as prejudice).  Thus, counsel is not deficient for failing to raise a weak issue.  *See Miller*, 882 F.2d

21  at 1434.  In order to demonstrate prejudice in the appellate context, Petitioner must show that, but

22

23   [6] In his petition, Petitioner claims that counsel failed to augment the appellate record with the May 16, 2006 transcript of his *Marsden* hearing until June 9, 2008.  However, the docket for Petitioner's case on appeal in the California Court of Appeal, Third Appellate District, Case No. C053802, reflects that the transcript was actually filed on December 19, 2007, prior to the appellate court's ruling on Petitioner's appeal.

24

25

26   [7] Petitioner was represented by appointed counsel on appeal.

20

for appellate counsel's errors, he would likely have prevailed on appeal.

### a.    Consecutive Sentencing

Petitioner claims appellate counsel rendered prejudicially ineffective assistance by failing to raise a claim on direct appeal that the trial court improperly imposed consecutive sentences for his convictions based on enhancements that should have been applied only once instead of on each count, thus violating his right not to be subject to double jeopardy.  In addition, Petitioner claims that appellate counsel should have raised an ineffective assistance of trial counsel claim based on trial counsel's failure to object to the sentence imposed on the same grounds.

To the extent that Petitioner argues that the trial court violated federal law by imposing consecutive sentences, such a claim is beyond the scope of federal habeas corpus review. *See Cacoperdo v. Desmosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) ("The decision to impose sentences concurrently or consecutively is a matter of state criminal procedure and is not within the purview of federal habeas corpus."); *accord Souch v. Shaivo*, 289 F.3d 504, 507 (9th Cir. 2002) ("Because the trial court actually had *absolute discretion* to impose either consecutive or concurrent sentences[,] . . . neither an alleged abuse of discretion by the trial court in choosing consecutive sentences, nor the trial court's alleged failure to list reasons for imposing consecutive sentences, can form the basis for federal habeas relief." (emphasis in original)).  Petitioner's double jeopardy claim is discussed below.

Petitioner stands convicted of four of the six charges he faced.  First, he was convicted of evading a peace officer with reckless driving, in violation of CAL. PENAL CODE § 2800.2(a), based on his failure to yield to the  attempted traffic stop conducted by Officer Nishimi and Officer Diaz.  Second, he was convicted of making threats of injury to Officer Nishimi while in the performance of his duties, more specifically while the officer was in the process of arresting Petitioner, in violation of CAL. PENAL CODE § 71(1).  His third conviction was for resisting Officer Nishimi's attempt to arrest him by means of force or violence, in violation of CAL. PENAL CODE § 69. Fourth, Petitioner was convicted of making threats to commit a crime resulting in death or great

bodily injury to Officer Losh, in violation of CAL. PENAL CODE § 422.

In addition, the jury found true all alleged sentencing enhancements.  Thus, the jury found true the allegations that Petitioner had suffered two prior strikes, CAL. PENAL CODE § 667(e)(2), based on his 1993 conviction for rape and his 1997 conviction for assault; two prior serious felony convictions, again based on his 1993 and 1997 convictions, CAL. PENAL CODE § 667(a)(1); and two prior prison commitments, CAL. PENAL CODE § 667.5(b).

The prosecution conceded that sentencing should be stayed on either Petitioner's conviction under section 71(1) or section 69 because both convictions were based on the same underlying facts and thus would likely subject Petitioner to double jeopardy under CAL. PENAL CODE § 654(a), which provides that an "act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  Accordingly, Petitioner was sentenced to consecutive terms of twenty-five years to life on each count, with imposition of the sentence for section 69 stayed pursuant to section 654, totaling seventy-five years to life.  Likewise, sentencing enhancements were imposed for consecutive terms of five years for each of Petitioner's two prior  convictions, CAL. PENAL CODE § 667(a)(1), and one year for each of Petitioner's two prior prison commitments, totaling twelve additional years.  No sentence enhancement was imposed based upon Petitioner's two prior strikes, CAL. PENAL CODE § 667(e)(2), which were based on the same underlying convictions as the sentence enhancements imposed based upon two prior serious felony convictions, CAL. PENAL CODE § 667(a)(1).  Petitioner's aggregate sentence was thus eighty-seven years to life with the possibility of parole.

The Double Jeopardy Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb. U.S. CONST. AMEND. V.  The provision protects against a second prosecution for the same offense and multiple punishments for the same offense.  *Witte v.*

*United States*, 515 U.S. 389, 396 (1995); *United States v. Wolfswinkel*, 44 F.3d 782, 784 (9th Cir. 1995). Sentence enhancements, however, do not "punish" a defendant within the meaning of double jeopardy. *United States v. Watts*, 519 U.S. 403 (1997). Rather, they increase the given sentence because of the manner in which the crime was committed. *Id*. "[T]he defendant is punished only for the fact that the present offense was carried out in a manner that warrants increased punishment." *Id*. at 155 (quoting *Witte*, 515 U.S. at 403).

To the extent that Petitioner's double jeopardy argument is based on an allegation that he was punished multiple times for the same offense, he is incorrect. First, his conviction and the punishment imposed for evading a peace officer is based upon his failure to respond to an attempted traffic stop and the subsequent police chase which ensued. Petitioner's convictions for threatening Officer Nishimi and for resisting Officer Nishimi's attempt to arrest him are based upon his behavior following the conclusion of the car chase in which Petitioner was verbally abusive and physically violent toward the officer. Although these convictions are based on the same underlying conduct, a double jeopardy violation was avoided by the trial court's decision to stay punishment on Petitioner's conviction for resisting arrest. Petitioner's conviction for threatening Officer Losh is based on his behavior at the jail while being booked. Likewise, although the jury found all alleged sentencing enhancements to be true, the court did not impose penalties on both sets of enhancements based on Petitioner's 1993 and 1997 convictions. Accordingly, Petitioner's sentence does not impose upon him multiple punishments for the same offense, and does not run afoul of the protections provided by the Double Jeopardy Clause.

Petitioner asserts that appellate counsel rendered ineffective assistance for failing to raise his double jeopardy claim on direct appeal and for failing to raise an ineffective assistance of trial counsel claim on the same grounds. For the reasons stated above, however, Petitioner's allegations do not raise a valid claim of double jeopardy. It is thus clear that a double jeopardy claim or an ineffective assistance of trial counsel claim based on double jeopardy would have been without merit. Accordingly, appellate counsel did not render ineffective assistance in not raising

the issue. *See Strickland*, 466 U.S. at 687-88 (appellate counsel is not ineffective for failing to raise a meritless issue).

Petitioner is not entitled to federal habeas corpus relief on this claim.

### b.    Jury Instructions

Petitioner claims that appellate counsel rendered prejudicially ineffective assistance by failing to raise a claim on appeal that the jury instructions did not include the names of his alleged victims as well as a claim that trial counsel rendered ineffective assistance by failing to object to the jury instructions on these same grounds. The merits underlying this claim have already been discussed extensively and rejected above with regard to Petitioner's claim that trial counsel rendered ineffective assistance for failing to raise the same claim at trial. Because the claim is without merit, appellate counsel's decision not to raise it on appeal cannot fall outside the bounds of reasonably competent professional assistance. As noted above, there is no obligation to raise meritless arguments on behalf of a client. *See Strickland*, 466 U.S. at 687-88. By the same reasoning, Petitioner has failed to demonstrate that he suffered any prejudice as a result of counsel's alleged error because there is no likelihood that the claim would have been successful on appeal.

Petitioner is not entitled to federal habeas corpus relief on this claim.

### c.  Notice of Appeal

Petitioner claims that appellate counsel rendered prejudicially ineffective assistance by failing to raise any of the seven claims identified as appealable issues by Petitioner's trial attorney in his notice of appeal. In his traverse, however, Petitioner clarifies that he did not expect or intend counsel to appeal based on all non-frivolous grounds raised in his notice of appeal. Rather, Petitioner complains that counsel should have pursued a claim that trial counsel rendered prejudicially ineffective assistance by failing to object to the consecutive sentencing terms imposed for his convictions and for failing to object to the jury instructions because they lacked the names of the alleged victims. In addition, it appears that Petitioner wished for appellate counsel to claim on appeal that the trial court's denial of his *Marsden* motion caused him to receive ineffective

24

assistance of trial counsel, as well as a claim that the jury instructions given at trial were insufficient because they did not specify the victims' names.  According to Petitioner, had counsel appealed on these grounds, his conviction would have been reversed.  Instead, however, Petitioner argues that appellate counsel raised what he considers to be two frivolous claims on appeal.

The merits of the claims based on consecutive sentencing and jury instructions which now form the basis for Petitioner's ineffective assistance of appellate counsel claim have been discussed extensively and rejected above.  In addition, the merits of Petitioner's *Marsden* claim is fully addressed on the merits and rejected in subsection (V)(B), below.  Because these claims are without merit, Petitioner has failed to demonstrate that appellate counsel's performance was deficient because she was under no obligation to raise meritless arguments on appeal.  *See Strickland*, 466 U.S. at 687-88.  Moreover, once again, there is no indication that Petitioner suffered any prejudice as a result of appellate counsel's alleged errors because Petitioner does not establish that any of the claims would have been successful on appeal.

To the extent that Petitioner claims that appellate counsel was obligated to raise any of the claims identified in trial counsel's notice of appeal and instead raised what Petitioner considers to be two "frivolous" claims, this argument is also without merit.  Appellate counsel's decision to raise other issues that she believed, in her professional judgment, had more merit than the claims suggested by Petitioner was clearly "within the range of competence demanded of attorneys in criminal cases."  *McMann v. Richardson*, 397 U.S. 759, 771 (1970).  *Jones*, 463 U.S. at 751-52 (Appellate counsel has no constitutional duty to raise every issue where, in the attorney's judgment, the issue has little or no likelihood of success.).  Indeed, "appellate counsel who files a merits brief need not (and should not) raise every non frivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  As the Ninth Circuit has observed:

> In many instances, appellate counsel will fail to raise an issue because she forsees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one

25

> of the hallmarks of effective advocacy . . . .  Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) for the same reason-because she declined to raise a weak issue.

*Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).  Thus, given the broad discretion afforded appellate counsel in exercising professional judgment with respect to which claims should be pursued on appeal, the presumption that appellate counsel has provided effective assistance is overcome "only when ignored issues are clearly stronger than those presented." *Id*. at 288. (citing *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).  Petitioner has failed to demonstrate that any of the claims specified above or identified in trial counsel's notice of appeal were stronger than the two claims appellate counsel chose to present on appeal.  Petitioner's disagreement with what appears to be a reasonable tactical decision by counsel in selecting grounds for appeal cannot form the basis for federal habeas corpus relief.  *Strickland*, 466 U.S. at 689.  *See also Jones*, 463 U.S. at 754 ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy . . . . ").

Petitioner is not entitled to federal habeas corpus relief on this claim.

### d.  Failure to Augment the Appellate Record

Petitioner claims that appellate counsel failed to augment the record on appeal with the transcript of his May 16, 2006 *Marsden* hearing until after the appellate court had already affirmed his conviction.

Petitioner is factually mistaken with respect to the date the transcript of his *Marsden* hearing was filed.  The docket for Petitioner's appeal in the California Court of Appeal, Third Appellate District, Case  No. C053802, clearly reflects that on September 27, 2007, the appellate court ordered the record to be augmented with the transcript of Petitioner's May 16, 2006 *Marsden* hearing by October 17, 2007.  The docket does not reflect whether the obligation fell upon the appellant or the respondent to file the transcript, but it appears that the transcript was untimely filed

26

on December 19, 2007, almost two months after the deadline set by the appellate court.  The appellate court did not affirm Petitioner's conviction until April 30, 2008, thus it is clear that the transcript was filed prior to the court's affirmation of Petitioner's convictions.

Assuming that appellate counsel failed to timely comply with the appellate court's order to supplement the record with the transcript of his May 16, 2006 *Marsden* hearing, Petitioner has failed to prove prejudice.  As discussed at length in section (V)(B), below, Petitioner's claim that the state trial court violated Petitioner's right to the effective assistance of counsel by denying his *Marsden* motions is without merit.  Thus, even if counsel had timely filed the transcript with the court, Petitioner has failed to demonstrate a probability that the outcome of his appeal would have been different.

Petitioner is not entitled to federal habeas corpus relief on this claim.

### e.  Reply Brief on Appeal

Petitioner claims that appellate counsel rendered prejudicially ineffective assistance by failing to timely file a reply brief on appeal, thus denying Petitioner the opportunity to rebut the respondent's reliance on *People v. Bell*, 40 Cal.4th 582 (2007), in its opposition to Petitioner's claim on appeal that the trial court improperly denied his claim that the prosecutor excused the sole African-American member of the jury panel for discriminatory reasons, in violation of his rights under *Batson v. Kentucky*, 476 U.S. 79 (1986), and *People v. Wheeler*, 22 Cal.3d 148 (1978).[8]

The record reflects that appellate counsel filed the reply brief on appeal over two months after it was due and, consequently, it was rejected by the court as untimely on February 15, 2008.  Appellate counsel requested that the court grant a retroactive extension of time to file the reply brief because she in good faith believed, due to what she characterized as the atypical procedural posture of the appeal, that the reply brief had been timely filed.  The appellate court denied the request.

---

[8] Petitioner's federal petition for writ of habeas corpus also alleges a *Batson-Wheeler* violation.  The claim is fully examined in subsection (V)(D), below.

A reply brief is generally not essential for appellate review under either the Federal Rules of Appellate Procedure or the California Appellate Rules. *See* FED. R. APP. P 28(C); CAL. APP. R. 8.200. As the Ninth Circuit has stated, "parties often decide not to file a reply brief as a matter of appellate strategy or because they perceive no need to do so." *U.S. v. Birtle*, 792 F.2d 846, 848 (9th Cir. 1986). Here, however, the record clearly reflects that appellate counsel *did* perceive a need to file a reply brief, but her failure to do so in a timely manner caused the appellate court to reject it. Under these circumstances, it cannot be said that appellate counsel made a strategic decision not to file a reply brief, or that she perceived no need to do so. Accordingly, appellate counsel's failure to timely file the reply brief fell below objectively reasonable professional standards. However, the inquiry does not end here because the "failure of counsel . . . to file a reply brief is not so essential to the fundamental fairness of the appellate process as to warrant application of a per se rule of prejudice." *U.S. v. Birtle*, 792 F.2d at 848 (citations omitted).

Thus, even though the record clearly indicates that the appellate court did not consider Petitioner's reply brief on appeal because of appellate counsel's deficiency, Petitioner still must demonstrate prejudice in order to establish that he is entitled to federal habeas corpus relief. To prove prejudice, it is not enough to show that appellate counsel's error had some conceivable effect on the outcome. *Strickland*, 466 U.S. at 693. Petitioner bears the burden of demonstrating a reasonable probability, in other words, "a probability sufficient to undermine confidence in the outcome" that, but for counsel's error, the result of the proceeding would have been different. *Id.* at 694-95. Petitioner has failed to make the required showing. Although he contends that appellate counsel's failure to file a reply brief denied him the opportunity to rebut the respondent's reliance on *Bell* in its opposition to his *Batson* claim on appeal, he does not identify what argument should have been made, nor does he cite any evidence or case law which would have rebutted respondent's reliance on *Bell*. Moreover, as discussed more extensively below, Petitioner's *Batson* claim is without merit. Consequently, Petitioner has not demonstrated that he suffered any prejudice as a result of counsel's alleged error. On this record, the failure of appellate counsel to file a reply brief

did not undermine confidence in the outcome of Petitioner's direct appeal because there is no reasonable probability that the outcome would have been different. *Strickland*, 466 U.S. at 694-95.

Petitioner is not entitled to federal habeas corpus relief on this claim.

**B.    *Marsden* Motion**[9]

Petitioner claims that the trial court's August 9, 2006 denial of his second motion to substitute counsel, filed after the commencement of jury selection, denied him the effective assistance of counsel at trial.  According to Petitioner, the trial court's denial of his motion forced him to proceed to trial represented by counsel with whom he was engaged in an "irreconcilable conflict."

### 1.    Background of Petitioner's April 21, 2006 (First) *Marsden* Claim

Prior to trial, Petitioner made several motions regarding his legal representation, including motions to substitute counsel and to be granted co-counsel status.  In addition, Petitioner may have considered dismissing his attorney altogether and representing himself, although it does not appear from the record that he filed a motion pursuant to *Faretta v. California*, 422 U.S. 806 (1975), or that a hearing was held on the matter.[10]  On April 21, 2006, Petitioner filed a motion pursuant to *People v. Marsden*, 2 Cal.3d 118 (1970), in which he claimed that he was not receiving adequate legal representation as a result of an irreconcilable conflict between himself and his attorney, Jessie Morris, Jr., Chief Deputy Public Defender for Yolo County.  In a *Marsden* motion, a criminal defendant in California requests that the court discharge his current counsel and appoint new counsel.  *Id*. at 122-124.  On May 16, 2006, the day before his preliminary hearing was set to

---

[9] Two *Marsden* hearings were conducted two different judges in Petitioner's case at the state trial level.  The first one, though relevant to Petitioner's current *Marsden* claim, is not itself the subject of the current claim.  It was held on May 16, 2006 before the Honorable William S. Lebov of the Yolo County Superior Court.  The second *Marsden* hearing was held on August 9, 2006, and it is this hearing that is the focus of Petitioner's current claim.  The second hearing was conducted by the Honorable Timothy L. Fall, also of the Yolo County Superior Court.  It is not uncommon in California for pre-trial proceedings to be conducted by multiple different judges.

[10] With a *Faretta* motion, a criminal defendant waives his right to counsel and instead exercises his constitutional right to self-representation.

commence, the Honorable William S. Lebov conducted a hearing on the *Marsden* motion, allowing

Petitioner to fully explain the reasons he sought to discharge Mr. Morris.  According to Petitioner,

Mr. Morris would not communicate with him and refused to inform him of the charges against him,

failed to provide him with discovery after promising to do so, and failed to respond to Petitioner's

attempts to contact him.  Based on his complaints, Petitioner stated that he did not trust Mr. Morris

to represent him going forward.  Mr. Morris responded to the allegations as follows:

> MR. MORRIS:    Before I speak to Mr. Semien's complaints, I have seen him twice at the jail.  And on the third occasion, which would have been the weekend of April 15th, he refused to leave his cell.
>
> He has refused to visit with me.  In spite of that, I have continued to investigate his case, I have an investigation report from the public defender investigator, he is checking up on one of the witnesses, a Charles Sparks.
>
> With respect to the charges, I -- I advised him with the charges are.  Secondly --
>
> THE COURT:    When did you advise him?
>
> Don't say anything unless I ask you.
>
> MR. MORRIS:    On each of the visits.  On the -- right after the 4th I photocopied every police report.  As the court knows, I have to redact addresses and phone numbers, the public defender has procedures where this is sort of a trouble check and make sure we don't miss anything and was sent by courier to Mr. Semien.  And when I say courier, it is by the county courier service, not the public defender taking it over.
>
> I called later that day after receiving notice and talked to Lieutenant Day, asking him if there -- excuse me, Lieutenant Day is a lieutenant at the Monroe Detention Center, asking if they log prisoner mail.  He said yes, but they don't log courier -- if something comes in through the county courier.
>
> So I am not able to establish that portion.

1    THE COURT:         Okay.   Just  a  second.   You  said  you
2                       photocopied  all  police  reports,  redacted
                        particular names -- or addresses and phone
3                       numbers,  whatever  it  might  have  been,  and
                        you sent it by county courier to him at the jail.

4                       When was that?

5    MR. MORRIS:        That  would  have  been  approximately  two
                        days after the 4th.

6
     THE COURT:         Okay.  But you have no confirmation that it
7                       was received over there?

8    MR. MORRIS:        That is correct.  I made an attempt to confirm.

9    THE COURT:         Okay.  Go ahead.

10   MR. MORRIS:        I can also indicate that there was some follow-
                        up  discovery  and  I  mailed  the  follow-up
11                      discovery also.  That was simply a blood test
                        --
12
     THE COURT:         U.S. mail?
13
     MR. MORRIS:        No, that was also by courier.  So there is
14                      actually two packets that would have gone

15   THE COURT:         Let me -- hang on for one second.

16                      Did you receive either of those?

17   THE DEFENDANT:  No, I did not, man.

18   . . . .

19   MR. MORRIS:        The only other thing I can probably add is that
                        Mr. Semien, when I went to the jail on those
20                      two occasions, he -- because of the nature of
                        the charges is under incredibly tight security.
21                      It takes two officers to transport him plus he is
                        in the company of one of the sergeants.  The
22                      sergeant escorted him with the Taser out, with
                        the Taser actually two feet from his side so
23                      that Mr. Semien could see it when he is
                        walking because of the fact that he has had, as
24                      reported to me, various incidences of violence
                        against officers at the jail.

25                      It takes almost one hour to see Mr. Semien
26                      before  he  is  brought  from  the  cell  because

31

1
2
3
4
they first want me to see him in what they call the glass, which is a noncontact visit and if I wish to have contact with him in the attorney room, it takes additional arrangements.

So just seeing him is an incredible problem. They told me they don't even wish to have much contact with Mr. Semien while there.

5
6
7
8
I bring that up so that when the Court knows I made two actual visits, I mean those are an extreme problem and when I went there for the third one he had refused to even come from the cell, so the Court understands what the difficulties are with Mr. Semien and the attorney contacts.

9    THE COURT:    Did you get the phone messages?

10
11
12
MR. MORRIS:    You know, I got the phone message.  I don't record the phone messages but that's -- one of those that prompted me to go see him on the weekend of the 15th and that's when he refused to come from the cell.

13
14
THE COURT:    Do you feel you can continue to represent him?

15    MR. MORRIS:    Yes, on my part.

16    Aug. RT at 10-14.  Judge Lebov then gave Petitioner the opportunity to respond to Mr. Morris'

17    explanation.  Petitioner reiterated that he did not trust Mr. Morris.  He also informed the judge that

18    Mr. Morris had refused to file a motion critical to his defense as Petitioner had requested.  Judge

19    Lebov further inquired regarding the motion as follows:

20    THE COURT:    Okay.  You talked about he didn't do a 17(b) or --

21    THE DEFENDANT:  17(b)(4).

22    THE COURT:    Do you know what that is?

23    THE DEFENDANT:  Yes, I do.

24    THE COURT:    What is that?

25
26

THE DEFENDANT:   It is basically anything that is a wobbler,[11] considered a wobbler, to reduce it to a misdemeanor on request to reduce it to a misdemeanor.

THE COURT:   Do you know what stage that normally is done?

THE DEFENDANT:   I believe it's done -- it can be done at arraignment and it can be done I guess when you are held to answer.

THE COURT:   Okay.

THE DEFENDANT:   Okay.  Go ahead.

THE COURT:   No, no.   It's almost never done at an arraignment, in large part because neither counsel is prepared at arraignment to deal with it.  When I say either counsel, I mean the public defender or the district attorney.  It is normally done at a preliminary hearing or at the time of the preliminary hearing.  So we are not there yet with your case.

It's most unlikely that it would be a reduction considered by whatever judge has it.  So the fact that it wasn't brought up or you didn't have a chance to discuss it with Mr. Morris probably isn't too significant at this point because for two reasons, one, it is not likely to be granted, number one, and number two, it is not normally done at this stage.

Okay.  Anything else you want to tell me?

THE DEFENDANT:   Can I ask why it wouldn't be granted?

THE COURT:   Yeah.  Likely not to be granted because of the nature of the charges, number one, they are serious charges, and number two, you have charges of strikes and this would probably mean that it is not going to be granted.

THE DEFENDANT:   Okay.  I object to that.

---

[11] In California, a wobbler is an offense that  is punishable as either a misdemeanor or a felony depending upon the specific circumstances surrounding the offense and the defendant's criminal history.

33

THE COURT:        I am not here to have a conversation or an objection or ruling on objections. I am just answering your question. You asked me why is it not likely to be done. I am telling you why it is not likely to be done. That is the end of that conversation.

Anything else you want to say about Mr. Morris?

THE DEFENDANT: I have nothing else to say.

Aug. RT at 15-16. After ordering Mr. Morris to have someone from the public defender's office hand deliver copies of the discovery documents that Petitioner claimed not to have received, Judge Lebov denied the *Marsden* motion, explaining as follows:

THE COURT:        Mr. Morris will remain as counsel. The breakdown, if there is one, is on the side of Mr. Semien, not counsel. Mr. Morris is an experienced attorney who can represent him. It is unfortunate that the reports got lost by the courier. He is not going to use the courier anymore for anything.

And do you want him to have a further discussion with you this week at the County Jail?

THE DEFENDANT: No, and what I want to say is since my rights are not going to be -- since my rights are going to be continued to be violated, I am going to let you know that I do not have anything to say to Mr. Morris or anything to say to anyone from the public defender's office.

THE COURT:        You have two options. You can accept Mr. Morris or you can defend yourself. You don't have to make that decision today. Nor do I have to deal with that. The matter is set for tomorrow at 8:30. Mr. Morris remains as counsel of record.

Aug. RT at 17.

Petitioner remained dissatisfied with counsel's representation, however, some six weeks later, on June 19, 2006, he filed a motion requesting to be granted co-counsel status due to

34

his unsuccessful attempt to substitute Mr. Morris by means of his earlier *Marsden* motion.  In his motion, Petitioner alleged that Mr. Morris was providing him with ineffective assistance and had become, in effect, a surrogate prosecutor in his case.  On June 22, 2006, Petitioner filed another *Marsden* motion.  The Honorable Stephen L. Mock addressed both of Petitioner's motions during a hearing on June 26, 2006.

With respect to Petitioner's June 19, 2006 motion, Mr. Morris indicated that he would refuse to serve as co-counsel with Petitioner.[12]  Petitioner claimed once again that Mr. Morris was performing ineffectively.  Moreover, Petitioner complained that he had authored motions which he had instructed Mr. Morris to submit to the court, however Mr. Morris refused to do so.  Petitioner informed Judge Mock that he had represented himself in court proceedings previously, but later specified that he had acted as co-counsel along with an attorney in those proceedings.  Judge Mock denied Petitioner's motion to be granted co-counsel status, determining that Petitioner had not made the required showing.  In addition, the judge informed Petitioner that even if he were to be granted co-counsel status, his attorney would be the ultimate decision maker with regard to what motions would be filed with the court.  Petitioner expressed his dissatisfaction with the judge's ruling, explaining that he should be granted co-counsel status because he knew the law pertaining to his case and what motions should be filed.  In addition, he complained that there was a conflict between himself and Mr. Morris and that he didn't believe Mr. Morris would "render [him] effective assistance especially after [he] turned [him] over to the American Bar Association and the California Law Bar Association and the state capital and the NAACP and the FBI."  RT at 8.  Judge Mock reiterated his finding that Petitioner had failed to make a substantial showing that granting his request would promote justice and judicial efficiency.  Mr. Morris then explained that Petitioner was not cooperating with him regarding the preparation of his own defense as follows:

---

[12] In fact, Mr. Morris indicated in later proceedings that the Yolo County Public Defender had a policy of declining to act as advisory or co-counsel, but would, under certain circumstances, agree to act as standby counsel.  RT at 128-29.

| | | |
|---|---|---|
| MR. MORRIS: | | At this point I would like to indicate that Mr. Semien has refused to communicate with counsel under any circumstances. |
| THE DEFENDANT: | | Objection. |
| MR. MORRIS: | | During the time that I went to visit him, even last night, he's refusing to leave his cell. |
| THE DEFENDANT: | | He never came to me. He never came last night. That's a lie. That's a lie. Don't sit up here and lie Morris. |
| MR. MORRIS: | | I was at the jail. They can show I logged in. And I was communicated that Mr. Semien refused to talk to me. |
| THE DEFENDANT: | | How many other times you seen me, Morris? |
| MR. MORRIS: | | I don't get to see you. You refuse to talk to me. |

RT at 10.

Judge Mock next addressed Petitioner's June 22, 2006 *Marsden* motion in which he argued that Judge Lebov, who conducted the May 16, 2006 *Marsden* hearing, erred by denying his request to substitute counsel. Explaining that a *Marsden* motion previously ruled on by one judge could not properly be re-litigated before another judge, Judge Mock denied the motion.

On July 14, 2006, Petitioner was removed from Judge Mock's courtroom due to his disruptive and unruly behavior during a hearing on a defense motion to dismiss. The record reflects that this was neither the first nor the last time that Petitioner was removed from the courtroom because of behavior problems during proceedings and his unwillingness to cooperate. At that point, counsel explained his efforts to represent Petitioner and the difficulties he was facing:

| | |
|---|---|
| MR. MORRIS: | I think it would be appropriate for the record to reflect that I made numerous attempts to communicate with Mr. Semien. He refuses to visit me at the jail when I'm there. He refuses to leave his cell. I'm not able to complete an attorney visit whatsoever. When I try to send him documents, he refuses to acknowledge receipt of the documents. Sometimes he'll return the documents back to me, and then |

36

he'll claim I made no attempt to give him the documents at all, and he'll claim I made no attempt to interview him.

I'm simply stating this for the record because I'm sure that at some point there will be issues that arise that would involve various things that I could have done if I had that information from my client, but in the situation I'm placed, I don't have that information because Mr. Semien won't communicate that to me, even though it looks as if he does through these writings - - with the matters that he files with the Court.

So I thank the Court for this opportunity to place this on the record.

THE COURT:           From my perspective, having dealt with Mr. Semien over the last several months, I can only confirm that you have done everything you could and attempted to do far more than Mr. Semien would allow.   That is Mr. Semien's decision to refuse to cooperate with you.   There is nothing that I've seen in this case that would suggest that you have done anything other than been entirely professional in the way you've conducted yourself and in the way you've handled the defense in this case.

RT at 30-31.

2.      **The August 9, 2006 (Second) *Marsden* Hearing**

Following the commencement of jury selection, Petitioner requested another *Marsden* hearing, which was conducted by the Honorable Timothy L. Fall on August 9, 2006.  Although it does not appear that Petitioner's written motion is part of the record, Judge Fall permitted him to read the motion into the record:

Okay.   This is dated for today, Tuesday.   It was originally dated August 1st.   But today is August 9th because I didn't have a trial on August 1st, 60 -- excuse me, speedy trial 60 day was violated.   So we're having it today.

I would first like to thank Honorable Judge Fall in the above-entitled courtroom for allowing me to address the Court. I, Anthony Semien, being the defendant in case number 06000991 would declare that

37

being in sound mind make the following statement:

February 16th I was unlawfully arrested by Officers Nishimi, Badge No. 13891, and Officer David Diaz Jr., Badge No. 15124, both California Highway Patrol Officers of the Woodland District.

I was then charged with the alleged Penal Code and Penal Code violations as a result of this unlawful arrest resulting from no probable cause and substantial illegal evidence arises out of this unlawful arrest.

I was then taken to Monroe Detention Center while subject to abuse. When I have documentation of proof as well as my inmate booking picture to show my bruised face, as I was forcely [sic] booked, admitted, only to be dropped on my face, cause [sic] me temporary blurred vision.  My thumb was also dislocated.

I was further charged for [sic] prior for this as I wrote officially [sic] citizen's complaint on March 1st, 2006, only to be charged shortly thereafter for this.

Also, I have documentation from Monroe Detention Center acknowledging receipt of a citizen's complaint March 1st, 2006.  I was then subsequently charged with the amendment charge of Penal Code 422, abuse was to me, was in violation of Penal Code 422.6, and done against me by Calvin Losh, 401; John Howard, Badge No. 463; Gary Hemsley, Badge No. 456, and Theodore Slikoff, Badge 14 at the Monroe Detention Center.  My attorney, Jessie Morris, Bar No. 84440, completely failed to litigate this matter at all.

On May 16 I had a Marsden motion hearing conducted in Department 9, Honorable Judge Lebov, William Lebov, concerning ineffective assistance of counsel.  My attorney of record, Jessie Morris, who was [sic] failed to investigate my case as well as give me any discovery and is exculpatory evidence.

Judge Lebov never properly addressed the issue and he said on record at the hearing on that date in that day's morning hearing, May 17th, 2006, that I was disrespective [sic] and argumentative.   Then subsequentially [sic] at the preliminary hearing examination, which was later that evening of 5-17 and 5-18 '06, which was May 17 and May 18th of '06, 2006, that I was possibly disruptive and argumentative.   However, he never firmly denied or granted my Marsden motion.

The defendant objects to the fact that me being argumentative. Because Marsden motion you have your say.  The attorney has his say.  Judge makes the ruling.  To be disruptive and argumentative do not have made no sense.

However, if this was true, and I say this hypothetically speaking,

Judge Lebov made his decision based on what alleged has happened in court.  Also, at the Marsden hearing, Judge Lebov, on record, stated that he was familiar with Mr. Morris' work and basically relying on Mr. Morris' courtroom skill to not relieve Mr. Morris and not to listen to the issue I was raising as far as ineffective assistance of counsel.

On May 17th and 18 my preliminary hearing was heard in Judge Lebov's courtroom.  This hearing was on the second date of hearing, which was May 18th.  And this is where the prosecutor, Carolyn Palumbo, tried to amend the charge unfairly and not properly.  The way she didn't do it is the original complaint had a Penal Code violation of 422.  That was from the CHP Vehicle Code violation of 2800.2.  Penal Code violation of 71, two of those, and Penal Code violation of 594, which is vandalism.

The first amended complaint that was done did not specify the first amended and the original did not specify any of the supposed victims' names.  The prosecution said that they amended the charge to be attempted, to be amended with the original complaint.

However, the first amended complaint was the exact same as the amended complaint as the first original complaint.  So prosecutor never made an attempt to amend the charge.  At the preliminary hearing she used the discovery under Penal Code 866(b) for the purposes of the preliminary hearing as she said she gave discovery to my attorney.

Throughout this entire judicial proceeding after he was held to answer for alleged charges and bound over to superior court, the court dates of June 26th, 2006, June 29th of 2006 and July 17th, 2006, I have been objecting to these illegal charges and enhancements and illegal due process of my own available objections.

I say my own available objections due to the fact that I personally gave my motions to my attorney, Jessie Morris Jr., with instructions to file immediately.  However, he did not file any of my motions.  And these motions are very important to my case as one of these motions I gave him was a motion to strike the alleged prior, Placer County Superior Court for violation of Penal Code 591, cutting a utility line, which was unconstitutionally given and was not serious nor violent felony.  That's what the strikes came from.

Under State versus Cobane, State versus Hare, State versus Badger, federal case laws, that was an illegal sentence.  It was illegally induced and should not have even been in there, should not even been included in the accusatory plea.

I did not receive my preliminary hearing transcript from Mr. Morris until June 23rd, 2006 as the transcript availability was late and be

[sic] made available until June 14th.

Prosecutor Palumbo asked for a motion to continue trial till August 1st from the original date of July 25th, 2006, citing unavailability of investigating Officer Daryl Nishimi due to his vacation.  I objected to this continuance.  And my due process cannot be comprised due to someone's personal life.

Judge Mock not only moved the jury trial back one week, also even though the prosecutor never asked for this, moved up my motion hearing two whole weeks to June 26th, 2006, from the original date of July 10th of 2006.  This hurt my due process even more because investigating Officer Nishimi never had to be at jury trial -- excuse me, never had to be at the Marsden hearing.  He only had to be at the jury trial.

So for Judge Mock to move the motion hearing up two weeks it made no sense, combined with the two weeks of the preliminary hearing transcript being late that denied me 28 days of the 60-day due process to file my motions.

At this hearing, June 26th, 2006, I personally on record asked Judge Mock to let me submit my motions and only for the purpose of that to go cocounsel because Mr. Morris would not do it.  I made this request and exercised my Rules of Court 4.117 right to local counsel.  I only want local counsel for those only purposes of submitting my motion.

I was still denied by Judge Mock and left completely -- I was still denied and left at the complete mercy of my attorney Jessie Morris to submit the motions and he never did, leaving me no defense basically at all in my only on record objections.  It is beyond, I believe, that Jessie Morris Jr. being Chief trial deputy counsel would render this kind of ineffective assistance of counsel.

Finally, been set throughout the course of that proceedings that I have suffered illegal enhancements.  This claim is in regards to the original first and second amended complaint as well as the third amendment complaint, which I haven't even seen yet, citing the enhancements against me.

These enhancements, like I say, were unjust and I do not have any qualifying serious or violent felonies defined under Penal Code 969(f), 12022.7(b) as well as 667(b)(I), 1170.12, two strikes, and 1170.125 proposition 184 is not retroactive.

This is only -- this is also reason why I was ineffective assistance of counsel by Jessie Morris Jr.  Because I gave him the motion to strike priors approximately June 29th, 2006, with instructions to file it immediately; however, he did not.  Therefore leave me completely exposed to these illegal enhancements with no defense at all.

40

On July 24th, 2006, Judge Arvid Johnson's courtroom, Department 5, prosecution amended the third amended complaint charging me with a five-year prior. I objected to it. However, only lawyer, Jessie Morris Jr., stopped me from making the objection. I did this objection because I don't have any qualifying priors to constitute a 667(a)(1) enhancement.

Penal Code 591, cutting utility line, as I said before, is not a serious violent felony. This is why I have been trying to relieve Mr. Morris as I also on June 11th, 2006, July 9th, 2006, July 17th, 2006, and July 24th, 2006, submitted letters and copies of all my motions to the chief trial counsel who I am referring to by the California State Bar on whom I initially wrote May 24th of 2006 with my complaints of Mr. Morris. And they gave me requesting number 06-18619 as they are currently investigating my claim of misrepresentation by Mr. Morris.

Also submitted motions to the Judicial Performance Committee as witness to my intent and desire to submit a motion because Mr. Morris would not do it. And I was precluded from doing it myself.

I only have one motion now that I would like to file with the Court and that is a motion to strike my prior conviction. That is, however, my only defense in this case of the matter. I understand that the justice process has to run its course. So basically I will try and not be a disruption to the court. I don't believe I'm disrupting. If I don't speak out about it, my lawyer doesn't speak out, the misstatement that -- Penal Code 996, waive the error, and I do not waive any error nor any constitutional rights that I have.

So that is why I'm stating for the record that my continuous full objections of these entire proceedings. And I've been on hunger strike since July 22nd, 2006.

I give thanks to the Court once again for allowing me to address the Court. And please investigate all my claims as documentation would prove this fact. And that on subsequential [sic], any subsequential [sic] conviction of me, Case No. 06000991, would be appealed by my [sic] and any future representatives and not Mr. Morris or anyone from the Yolo County Public Defender's Office. This statement was signed and dated, submitted by penalty of perjury by Defendant Anthony Marvell Semien dated today, Tuesday, August 9th, 2006.

RT at 100-108.

After reading his letter into the record, Petitioner requested to address the court further in order to provide additional information regarding his *Marsden* motion. According to Petitioner, he was constantly telling Mr. Morris to "do certain things," but Mr. Morris simply did not do them, leading Petitioner to do them "under duress." RT at 109. For example, it appears that

41

Petitioner would have liked Mr. Morris to oppose the proposed amendment of the charges against him to include charges stemming from his behavior during his booking at Monroe County Detention Center. RT at 109-110. According to Petitioner, Mr. Morris "did not litigate this matter at all." RT at 110. Petitioner also claimed that he gave Mr. Morris "a packet of motions," but "he never filed them." *Id.* In addition, Petitioner complained that Mr. Morris failed to subpoena a witness, Mr. Charles Sparks, to testify and, in fact, never attempted to get in touch with him. As discussed in a previous subsection, Petitioner claimed that Mr. Sparks was the actual driver of the vehicle, and not himself. Petitioner contended that if Mr. Sparks had testified at his preliminary hearing, at least one of the charges against him would have been dismissed. Petitioner claimed that Mr. Morris had not "done anything effective for [his] defense." RT at 111. He once again alleged that he had not received any of the discovery that Mr. Morris had promised to send to him. Additionally, Petitioner attributed his disruptive behavior in the courtroom to Mr. Morris' failure to object to the many errors Petitioner perceived in the proceedings and, accordingly, Petitioner's view that if he did not personally lodge an objection then he would waive his right to challenge any perceived errors on appeal. RT at 112-113.

After Petitioner articulated the grounds for his *Marsden* motion, Mr. Morris was given an opportunity to respond. Judge Fall questioned Mr. Morris regarding his representation of Petitioner up until the point of the hearing as follows:

> THE COURT:    How long have you been representing Mr. Semien?
>
> MR. MORRIS:    Right after he was arraigned. Probably within a week of arraignment I received the case.
>
> THE COURT:    What have you done to represent him?
>
> MR. MORRIS:    I went to speak with Mr. Semien at the jail. He was kind enough to meet with me on the two occasions. After that he's always refused. I think the crux of his complaint has more to do with the investigation. I think if I can concentrate on that.

42

| | |
|---|---|
| THE COURT: | All right. |
| MR. MORRIS: | His insistence is that he was not the driver of the vehicle that was stopped and that the person that was the driver of the vehicle was a person named Charles Sparks. |
| | What I've done is sent an investigator out to speak with Mr. Sparks. That investigator met with Mr. Sparks on May 8th, 2006. The problem that arises is as follows. He believes that Mr. Sparks did in fact give somebody else's identification as a name. The belief is because he has an outstanding warrant and he had a suspended driver's license. |
| | Mr. Sparks informs my investigator that he was in the back seat of the car. He was intoxicated, asleep, primarily because of alcohol, and passed out. And Mr. Semien was evading the officers and was stopped. Mr. Sparks denies driving the car and just [sic] simply placed in a taxi by the CHP and sent home. |
| THE COURT: | Let's talk about Mr. Sparks' statements to the investigator then. Your client says that Mr. Sparks was driving. |
| MR. MORRIS: | Yes. |
| THE COURT: | Why had you decided not to subpoena Mr. Sparks for trial so that he would be required to give his version of the events faced by your client to see whether he would testify consistently to what your client says happened or with what Mr. Sparks told your investigator back on May 8th? It's a trial tactic and -- |
| MR. MORRIS: | I understand. I can't be vaulted either way. May be the tactic. This is the understanding Mr. Semien related to Mr. Sparks. And I've had contact with his entire family. Mr. Semien tells me he doesn't want to get Mr. Sparks in trouble and doesn't want to get him prosecuted for anything. |
| | Mr. Sparks, on [sic] the interview, denies the facts that Mr. Semien makes with respect to who was driving. The CHP report makes it |

43

clear that at least talking about the following the vehicle and that Mr. Semien was -- part of the CHP was in fact driving so from the CHP standpoint, the facts that they have, Mr. Semien is the driver. Mr. Sparks denies driving.

The contact that I've had indirectly through relatives is such that Mr. Sparks is believed not to have been the driver but just simply in the vehicle and trying to avoid arrest on an outstanding ticket. So I'm finding no validation of what Mr. Semien says, other than having given a different name.

The crux of this case goes more towards the behavior after the stop as opposed to the evading the officers. Not to diminish the evading issue, but he has greater problems than that. And with the failure of politics and various propositions that are on the ballots for consideration, Mr. Semien may have some opportunity to have his sentence changed because one of the ones that seems to be popular at the moment requires the third strike to be a serious or violent felony which [sic] for the life sentence.

So the real focus has more to do with reducing the -- or taking off the one strike that is charged. The nature of Charles Sparks with Mr. Semien's desire not to get him into trouble, the lack of validation I can find, I've decided not to call him at all.

THE COURT:       For the moment, let's put aside Mr. Semien's comments that he doesn't want to get Mr. Sparks into trouble and assume that he'd rather have him here even if it does get him into trouble. Would you still decide not to call Mr. Sparks?

. . . .

MR. MORRIS:      I probably would not call him.

THE COURT:       What is the danger you see from calling Mr. Sparks as a witness?

MR. MORRIS:      The problem is going to be a conflict between Mr. Sparks and Mr. Semien. In terms of the

44

testimony, should Mr. Semien get on the stand and if Mr. Semien testified the only other person that would have been in the vehicle that's Mr. Sparks and he primarily would have been impeached.   The observations of the California Highway Patrol officers would, in addition, impeach him.

So it would look like an act of desperation on our part, even if the testimony of Mr. Sparks is true.   And probably will not go to a sufficient weight because a portion of the evading the officers would clearly say that Mr. Sparks -- pardon me, Mr. Semien was the driver. So probably would add very little to it.

And in these cases, if he's -- Mr Semien has any chance at all, i[t] might relate to his testimony and the righteous indignation he shows with respect to how he was treated.

THE COURT:        The issues about how Mr. Semien was treated. Mr. Semien has stated that though [sic] it should have been brought up in earlier proceedings and should have been part of the trial, what have been your decisions on that?

MR. MORRIS:       At a preliminary hearing he was very insistent that I call witnesses at a preliminary hearing. As the court knows, it's rare to call witnesses at preliminary hearings because of the nature of the hearing, the low standard of proof, and the rules relating to the calling of defense witnesses at the preliminary hearing.  And so I would not call them at a preliminary hearing.

He wanted, in addition, what's typically known as a Romero[13] motion to be filed.  The problem it's a discretionary motion.  And in the interests of justice, in a large part, Mr. Semien's conduct talks in terms of being disruptive.  But the nature of his disruption is such that anybody having discretion probably would not ever want to use it for a person that is doing things unless one would be heard -- is

---

[13] Pursuant to the holding of the California Supreme Court in *People v. Superior Court (Romero)*, 13, Cal.4th 497 (1996), a trial court has statutory discretion under Cal. Penal Code § 1385(a) to dismiss prior serious felony convictions alleged for sentence enhancement purposes, even in the absence of a motion requesting that action by the prosecuting attorney.

heard as he's leaving the courtroom as opposed to within the proceedings themselves.

And Mr. Semien's reputation of being disruptive is growing as the proceedings are taking place. I'm sure that everyone has heard it. So assuming he settles down, it appears that maybe the motions could be brought at a more opportune time.

With respect to the injuries he had specifically observable on the chin, he probably has the best photograph as it relates to a view where he's had a spit mask on. Underneath he's spitting at the officers. And the redness can be seen on his chin. I spoke to the District Attorney. We pretty much stipulated to the foundation so that will come into evidence during the course of his trial.

THE COURT:            The strikes, Mr. Semien says that one of them is -- Mr. Semien, I'm sorry. I forgot the code section. It's 25 -- the strike you were talking about.

THE DEFENDANT: 591.

THE COURT:            591. That it's 591 that's alleged against him. And I was reviewing the complaint and saw various allegations but I didn't see a 591 specifically listed. Mr. Morris.

MR. MORRIS:           That's my understanding also. I think what -- for part of this, the Court has to understand he's repeatedly refused to leave his cell to come to the attorney visiting booth, so I don't have much of an opportunity to understand his thoughts. So I'm making inferences and that's what I'm going to give the Court as to what my understanding is. I think what he's talking about has more to do with the situation where he initially comes to the attention of law enforcement officers, but it's the later evolution of something that takes place and that's the strike offense.

THE COURT:            Do you have Mr. Semien's rap sheet as part of the discovery?

MR. MORRIS:           I have his rap sheet and I have his --

46

| | |
|---|---|
| THE COURT: | I'm just wondering if it shows the 591 arrest or conviction [sic] some point in the rap sheet. |
| MR. MORRIS: | There's a 2001, 591 conviction from Roseville. |
| THE COURT: | January 30, 2001 Placer County.  Is that the one you have? |
| MR. MORRIS: | Yes. |
| THE COURT: | Go ahead. |
| MR. MORRIS: | All I can say, he's not -- he's not been an easy client.  And at this particular point in time I don't wish to file a demurrer.  The conversations we have is [sic] mostly when I'm standing with him at some proceeding. His belief is that if there is a conflict between he [sic] and the facts, he's waived something. If there's a failure to object, as an example, at the time of arraignment, there is an allegation, for example, the strikes, he believes that he has to object to each and every separate accusation in order not to waive a right. |
| | And what I'm telling him, he does that by entering a not guilty plea and denial of the enhancement.  And so his statement that I failed to object relates more to I told him not to do anything at the arraignment, for example, until at the end and enter the plea. |
| | This issue to motions to strike, Romero, and so forth was also the issue of the Marsden motion before Judge Lebov.  Actually had [sic] a discourse on the record with respect to the motion to strike.  And at that time I believed it was understood, at least through the discourse and the agreement by Mr. Semien, that these matters would be at issue all the way throughout the proceedings to including at the time of sentencing.  And Mr. Semien, I thought, understood it. |
| | So when he's saying that the Court did not make a ruling, I think what he's referring to is the judge did not make a ruling as to some of those because Mr. Semien pretty much agreed he understood that the timing on many of these were premature. |

1    THE COURT:              Anything else, Mr. Morris?

2    . . . .

3    MR. MORRIS:             Actually, let me speak to the 995 motion that
                             was made.

4    THE COURT:              Okay, go ahead.

5    MR. MORRIS:             There was a transcript that was almost a
6                            month late from the court reporter. And as the
                             Court knows, the 995 typically refers to the
7                            transcript and because of the late preparation
                             of the preliminary hearing transcript. And
8                            there were two separate court reporters with
                             two separate transcripts. Half the proceedings
9                            were late.

10                           I filed the 995 shortly after receiving the copy
                             of the transcript. So when he's saying that
11                           that was late in some fashion, it was later than
                             anybody wanted but it was timely under the
12                           circumstances that was [sic] at issue during
                             the filing of the 995. Judge Mock indicated
13                           that it was past the motions deadline, but he
                             found good cause because of the lateness of
14                           the preliminary hearing transcript.

15                           The demurrer, he wanted me to demurrer to
                             all of these complaints and informations. I
16                           advised Mr. Semien that one of two times that
                             he did early in the case that there were no
17                           names in the complaint, but informed verbally
                             by Ms. Palumbo as to who the charges were
18                           against.

19                           If I demurrer, I mean, she can simply amend.
                             But there was no mistake or confusion upon at
20                           least the parts of litigants based upon the
                             verbal notice. At the time of the preliminary
21                           hearing when they introduced evidence of an
                             incident that was not in the complaint and not
22                           charged at all, she acknowledged on the
                             record that that was not charged. So that,
23                           again, there was no misinformation or
                             confusion with respect to that issue. It
24                           appears better practice would be not to
                             demurrer and require specificity in charging
25                           documents.

26                           But this is how the litigants, if choose to [sic],

48

> handle this because of the nature of the charge. When the information was filed and in superior court, I was involved in a ton of other litigation. My understanding was that there was going to be a change made in the charging documents.
>
> As time went on, nothing happened. So I did in fact bring the demurrer for the purpose of making it more specific and the specific names were added. And that was also required so that it would clarify Count 6 of the amended information so that the 995 could go to the specific count. Because even if everyone knows what was involved, it's hard to attack if there's no name to it.

RT at 115-124.

After weighing Petitioner's claims and counsel's statements, Judge Fall orally denied Petitioner's *Marsden* motion, explaining that Mr. Morris was afforded a significant amount of discretion when it came to making strategic decisions about how best to proceed at trial. With regard to the prior strike and prison term allegations, Judge Fall noted that the point of the trial was to determine whether the prosecution had proven or not proven those allegations. Ultimately, the court concluded that Mr. Morris' performance had not fallen below the standards of a competent attorney and that he was providing Petitioner with proper representation.

### 3.     Legal Analysis

Where a criminal defendant is proceeding with the assistance of counsel, he may move to dismiss or substitute counsel, whether appointed or retained. The denial of a motion to substitute counsel can implicate a criminal defendant's Sixth Amendment right to counsel and, therefore, presents a cognizable claim for federal habeas corpus relief. *Bland v. California Dep't of Corrections*, 20 F.3d 1469, 1475 (9th Cir. 1994).

Whether a trial court grants or denies a motion to substitute counsel may depend on the motion's timeliness and the nature of the conflict between a defendant and his counsel. *United States v. Musa*, 220 F.3d 1096, 1102 (9th Cir. 2000); *United States v. McClendon*, 782 F.2d 785, 789

(9th Cir. 1986); *Hudson v. Rushen*, 686 F.2d 826, 829 (9th Cir. 1982).  When a defendant indicates dissatisfaction with his counsel, the trial court must conduct an inquiry in order to discover whether the situation is depriving the defendant of an adequate defense.  *Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) ("[I]t is well established and clear that the Sixth Amendment requires on the record an appropriate inquiry into the grounds of such a motion and that the matter must be resolved on the merits before the case goes forward.");  *Hudson*, 686 F.2d at 829 (The state trial court's summary denial of a defendant's motion for new counsel "without further inquiry" violated the Sixth Amendment.).  A trial court's inquiry regarding counsel's performance should be "such necessary inquiry as might ease the defendant's dissatisfaction, distrust, and concern."  *United States v. Garcia*, 924 F.2d 925, 926 (9th Cir. 1991) (internal citations omitted).  It should also provide a "sufficient basis for reaching an informed decision" regarding whether to appoint new counsel.  *McClendon*, 782 F.2d at 789.  If failure to conduct the proper inquiry results in the constructive denial of counsel, it constitutes per se error.  *Schell*, 218 F.3d at 1027 ("the basic question is simply whether the conflict between [the petitioner] and his attorney prevented effective assistance of counsel").  The Ninth Circuit Court of Appeals has held that in assessing a trial court's ruling on a *Marsden* motion in the context of a federal habeas corpus proceeding, the Sixth Amendment requires only "an appropriate inquiry into the grounds of such a motion, and that the matter be resolved on the merits before the case goes forward."  *Schell*, 218 F.3d at 1025.

In this case, neither party takes issue with the timing of Petitioner's second *Marsden* motion, and Petitioner does not allege that the trial court failed to conduct an adequate inquiry with regard to the grounds of his motion or failed to allow him to express his concerns regarding counsel in full.  Indeed, as summarized above, the multiple state court judges conducted detailed inquiries with respect to Petitioner's complaints about Mr. Morris' inadequacies as counsel.  Petitioner was given adequate opportunities to discuss the basis for his complaints, and Mr. Morris was given adequate opportunities to respond.  After considering all of the available evidence at each hearing, each judge determined that Mr. Morris was providing constitutionally adequate representation to

50

Petitioner, clearly finding Mr. Morris' explanations regarding each of Petitioner's complaints to be credible. Moreover, the state court found that many of Petitioner's complaints stemmed from strategic decisions made by Mr. Morris in proper exercise of his discretion as counsel. It is also apparent that the judges all recognized that Petitioner was an unusually difficult client and that Mr. Morris was performing to the best of his abilities given the circumstances. The state court's factual findings are fully supported by the record and are entitled to a presumption of correctness, which Petitioner has not rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e). *See also Plumlee v. Masto*, 512 F.3d 1204, 1209 (9th Cir. 2008) (holding that state court factual findings are entitled to a presumption of correctness unless rebutted by clear and convincing evidence). The state court's determination is also supported by a full review of the record, which reflects that counsel engaged in a vigorous defense of Petitioner, despite Petitioner's refusal to cooperate with him throughout the course of the proceedings.

Even after a full inquiry, however, if the defendant and his attorney remain embroiled in an "irreconcilable conflict," refusal to allow substitution of counsel may, in some circumstances, result in denial of the constitutional right to assistance of counsel, *Hudson*, 686 F.2d at 832, or to the effective assistance of counsel. *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970). A federal court conducting habeas corpus review considers whether the trial court's denial of the motion "actually violated [the petitioner's] constitutional rights in that the conflict between [the petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." *Schell*, 218 F.3d at 1026. The "[l]oss of confidence by the defendant in his counsel weighs heavily in the defendant's favor when he seeks to substitute counsel," unless the breakdown in the relationship flows from a defendant's own conduct. *Hudson*, 686 F.2d at 832. "It may be the case, for example, that because the conflict was of [the defendant's] own making, or arose over decisions that are committed to the judgment of the attorney and not to the client, in fact he actually received what the Sixth Amendment required in the case of an indigent

51

defendant . . . ." *Schell*, 218 F.3d at 1026.  Accordingly, "not every conflict or disagreement between the defendant and counsel implicates Sixth Amendment rights," *Schell*, 218 F.3d at 1027, because the Sixth Amendment guarantees the effective assistance of counsel, not "a 'meaningful relationship' between an accused and his counsel." *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983).

In the present case, it is apparent that the conflict between Petitioner and Mr. Morris arose because Petitioner wanted Mr. Morris to do everything Petitioner suggested and wanted. When he disagreed with tactical decisions made by Mr. Morris, Petitioner became very angry and argumentative, often to the point that his removal from the courtroom was required because his behavior was so uncooperative and disruptive.  The record also reflects that, on multiple separate occasions, Petitioner refused to meet with Mr. Morris when he attempted to visit him at the jail.  In addition, Mr. Morris explained on the record that Petitioner refused to accept delivery of legal documents from Mr. Morris, and would then represent to the court that Mr. Morris never delivered or attempted to deliver the documents.  Petitioner's misrepresentation of Mr. Morris' efforts on his behalf constitutes a clear attempt to have him removed as counsel, and Mr. Morris' continued and proper exercise of discretion with regard to trial strategy appears to be the source of Petitioner's mistrust and lack of confidence in him as counsel.  "Disagreements over strategic or tactical decisions do not rise to [the] level of a complete breakdown in communication." *Stenson v. Lambert*, 504 F.3d 873, 886 (9th Cir. 2007).  Indeed, "a lawyer may properly make a tactical determination of how to run a trial even in the face of his client's incomprehension or even explicit disapproval." *Brookhart v. Janis*, 384 U.S. 1, 8 (1966). *See also United States v. Carter*, 560 F.3d 1107, 1113 (9th Cir. 2009) ("A conflict that is based solely on disputes regarding trial tactics generally is not the type of conflict that warrants substitution of counsel."); *United States v. McKenna*, 327 F.3d 830, 844 (9th Cir. 2003) (counsel's refusal to file motions not supported by the evidence is not sufficient conflict to warrant substitution).

Petitioner is not entitled to federal habeas corpus relief on this claim.

**C.    Prejudicial Misjoinder**

Petitioner claims that he was denied his constitutional right to a fair trial when the trial court permitted the prosecutor to amend the information to add a charge that was not included in the original complaint several weeks prior to the commencement of trial.  The amendment added a charge stemming from Petitioner's behavior at the jail while he was being booked following his arrest.  The charge was based on the preliminary hearing testimony of Sheriff's Deputy Rafael Vicente. The circumstances underlying the amendment of the information are described more fully in subsection (V)(A)(1)(a), above, which examines Petitioner's claim that counsel was ineffective for failing to cross-examine a witness.  Here, Petitioner contends that the delay in amending the charges against him was intentional and violated his rights to a fair trial and to due process of law.

"The 'sufficiency of an indictment or information is primarily a question of state law.'" *Tapia v. Tansy*, 926 F.2d 1554, 1560 (10th Cir. 1991) (quoting *Franklin v. White*, 803 F.2d 416, 418 (8th Cir. 1986).  However, the notice provided by a state in a charging instrument must comport with the due process guarantee of a fair trial.  *See Jackson v. Virginia*, 443 U.S. 307, 314 (1979) (it is "axiomatic" that "a person cannot incur the loss of liberty for an offense without notice and a meaningful opportunity to defend"); *Wilkerson v. Wyrick*, 806 F.2d 161, 164 (8th Cir. 1986) (applying this principle to habeas review of a charging instrument).

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the fundamental right to be clearly informed of the nature and cause of the charges against him in order to adequately prepare his defense.  *Cole v. State of Ark.*, 333 U.S. 196, 201 (1948).  Indeed, "[n]o principle of procedural due process is more clearly established than notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." *Id*. *See also Strickland*, 466 U.S. at 685 ("a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding"); *Jackson v. Virginia*, 443 U.S. at 314 ("a conviction upon a charge not made . . . constitutes a denial of due process").  The notice provision of the Sixth Amendment is

incorporated within the Due Process Clause of the Fourteenth Amendment and is applicable to the states. *Gautt v. Lewis*, 489 F.3d 993, 1003 (9th Cir. 2007).

Under California state law, "[t]he court in which an action is pending may order or permit an amendment of an indictment, accusation or information, or the filing of an amended complaint, for any defect or insufficiency, at any stage of the proceedings " as long as it conforms to the evidence presented at the preliminary hearing and the defendant's substantial rights are not violated. Cal. Penal Code § 1009; *People v. Graff*, 170 Cal.App.4th 345, 361-62 (2009); *People v. Jones*, 164 Cal.App.3d 1173, 1178 (1985).

In order to demonstrate that a delay in adding a count to a charging document violated his due process rights, Petitioner must demonstrate that he suffered actual "non-speculative" prejudice from the delay and that "the length of the delay, when balanced against the reason for the delay, must offend those fundamental conceptions of justice which lie at the base of our civil and political institutions." *United States v. Talbot*, 51 F.3d 183, 185-86 (9th Cir. 1995); *United States v. Huntley*, 976 F.2d 1287, 1290 (9th Cir. 1992). The burden of demonstrating actual prejudice is heavy. *Talbot*, 51 F.3d at 183. The evidence "must be definite and not speculative," and Petitioner must show "how the loss of a witness and/or evidence is prejudicial to his case." *Id.* (internal quotations omitted).

Petitioner's claim that the amendment of the charges against him violated his right to due process and a fair trial is without merit. Petitioner does not argue that the amended information failed to inform him of the nature and the cause of all the charges against him, and it is clear that the evidence presented at his preliminary hearing, specifically Deputy Vicente's testimony, was sufficient to support the amended charge. Moreover, the charges against Petitioner were amended during the preliminary hearing on May 18 and 19, 2006. Jury selection for Petitioner's trial did not commence until August 8, 2006. Petitioner thus had nearly three full months to prepare any additional defense in response to the amended information and the additional charge. Under these circumstances, it cannot be concluded that Petitioner received constitutionally

54

inadequate notice. *See, e.g., Stephens v. Borg*, 59 F.3d 932 (9th Cir. 1995) (five days notice of prosecution's intent to rely on a felony-murder theory sufficient to prepare a defense); *Morrison v. Estelle*, 981 F.2d 425 (9th Cir. 1992) (evidence presented during trial gave adequate notice of felony-murder theory on which instructions were sought two days prior to closing arguments). *C.f. Sheppard v. Rees*, 909 F.2d 1234 (9th Cir. 1990) (prosecution ambushed defense with new theory of culpability after both sides had rested and after jury instructions were settled).

Petitioner is not entitled to federal habeas corpus relief on this claim.

## C.     Prosecutor's Use of Peremptory Challenges

Petitioner, who is African-American, claims that the trial court violated his rights under the federal constitution by denying his *Batson-Wheeler* motion, in which he claimed that the prosecutor's given reasons for exercising a peremptory challenge against the sole African American prospective juror were a pretext for excusing the juror based upon a racial bias against African Americans.

The juror in question was Terrell Jones, an African-American pastor at Saint Baptist Church in Sacramento's Oak Park neighborhood who initially expressed concern that serving on Petitioner's jury would conflict with a funeral he was scheduled to conduct the following day. During voir dire, Pastor Jones was questioned regarding his and his wife's occupations by Ms. Palumbo, the prosecutor, as follows:

> MS. PALUMBO:        And, Mr. Jones, you said your wife worked for - - where does she work?
>
> [PASTOR] JONES:     Welfare department.  She's a clerk.
>
> MS. PALUMBO:        Is that in Sacramento?
>
> [PASTOR] JONES:     Yes, Del Paso Heights, Research Drive.
>
> MS. PALUMBO:        Do you have a lot of situations and times where you deal with young men maybe Mr. Semien's age as [sic] your role as a pastor with men his age?
>
> [PASTOR] JONES:     Deal with a lot of homeless people and a lot of

55

individuals that come through the church.

MS. PALUMBO:       Maybe people who might have some problems that they want to talk to you about?

[PASTOR] JONES:    Right.

MS. PALUMBO:       And you think you can separate lifestyle from charges?  Do you know what I mean?

[PASTOR] JONES:    Yes.

MS. PALUMBO:       I don't mean to harp.  It's just I don't have an opportunity to one-on-one with a pastor very often.  I would imagine forgiveness is sort of part and parcel of your work.  Is there anything about that, can you separate out, forgiving somebody and looking, you know, at whether a crime has been committed?

[PASTOR] JONES:    Yes, I can.

MS. PALUMBO:       And there's nothing about your beliefs or anything like that from a religious standpoint that's going to interfere with listening to officers?

[PASTOR] JONES:    No.

MS. PALUMBO:       Deciding this case fairly?

[PASTOR] JONES:    Huh-uh.

Aug. RT at 168-69.  Following the prosecutor's decision to exercise a peremptory challenge against Pastor Jones, defense counsel informed the court that he would like to make a *Batson-Wheeler* motion.

A *Batson-Wheeler* hearing was conducted by the trial court outside the presence of the jury panel.  Petitioner, through his counsel, Mr. Morris, sought to establish a prima facie case of prejudice as follows:

MR. MORRIS:        As it relates to Pastor Jones.  Pastor Jones is the only black juror presently on the panel.  The other one was released for cause by the court.

THE COURT:         Mr. Jolly.  Actually he was released on a

56

hardship. [He] was doing a house remodel.

MR. MORRIS: The questions that were propounded by the District Attorney were such that Pastor Jones' comments or responses were very similar to the other jurors. He didn't respond any differently. Any issues as it related to bias or how he view[ed] the defendant was not dissimilar to any of the other jurors that in fact responded.

And the prosecutor yesterday indicated to me that they were concerned with Pastor Jones' comments about the funeral and that seemed like it was significant if he were. So I asked questions about the funeral, and I probably would have under any circumstances even if the prosecutor hadn't brought it up, and it looked like he had made arrangements and the funeral was not an issue.

The fact that Mr. Semien is a black male, they're of the same race as Pastor Jones, the improper connection that is made that a prosecutor may not improperly challenge or even on a peremptory is the thought that people are of the same race would have some sort of kinship and for that purpose - -

THE COURT: I'm aware of the legal grounds. We're putting on the facts right now.

MR. MORRIS: Based upon the jury questioning and answers and responses for his are no different than the others, I would bring the [Batson-]Wheeler motion and ask this court to prohibit the peremptory.

RT at 140-142. The trial court found that defense counsel had presented a prima facie case of purposeful discrimination. Following this determination, the prosecutor, Ms. Palumbo, explained the reasoning behind her decision to exercise a peremptory challenge as to Pastor Jones:

MS. PALUMBO: Thank you. Mr. Jones' ethnicity had nothing to do with the People's decision to exercise a peremptory challenge in this particular case. Mr. Jones is a pastor of a Baptist church in Oak Park, which is an area known by me to have a lot of people who are underprivileged

57

and who live there.

He deals with homeless, and he's in a situation where not only is his occupation one of forgiveness and sympathy, that's the main gist of it, he's in an occupation where he deals with underprivileged people who are homeless who require counseling and who he talks to.  And I believe that that would put him in a situation where he would be more sympathetic towards a defendant, even though there's a jury instruction right on point that they're not supposed to take into consideration sympathy for a defendant.

I also took into consideration that his wife works for the welfare department.  This has nothing to do with Mr. Jones' ethnicity. I don't know what the ethnicity of his wife is. But between the two, they're [sic] combination of occupations is very sympathetic towards people who may be in a situation where people are trying to bring charges against them.

And I do not want to sit through a trial thinking about, you know, whether or not I made the right decision in kicking a particular juror from the panel.  That would take away from my concentration on the case, and I just didn't feel comfortable with having him sitting as a juror.

RT at 143-144. Defense counsel then offered the following rebuttal to the prosecution's explanation for excusing Pastor Jones:

MR. MORRIS:        The remark that Oak Park has a lot of population that's underprivileged is the way of saying that Oak Park has a predominantly black neighborhood.  The defense contention is that reasons given are pretextual to focus upon something that is race neutral and the fact that the race, which she also talks about, is sympathetic to the defendant is that [sic] the primary concern because it's a black minister from a black neighborhood and the defendant is black.

Excuse me.  I meant to say one other thing, if I may.

58

| | | |
|---|---|---|
| THE COURT: | All right. | |

MR. MORRIS:     The part about being underprivileged, there's nothing related to him that he was homeless or underprivileged in probably the sense that we mostly think in terms of those people that are poor. He was coming back from a friend's and family reunion. He has a lot of family. His family is here in court. So the idea that he's homeless or underprivileged in that sense is not a factor.

RT at 144-145. After listening to the above arguments, the trial court rejected the *Batson-Wheeler* motion, explaining its reasoning as follows:

THE COURT:     All right. The comments about working with the underprivileged or working in the church neighborhood where there are many underprivileged people goes to the perception of whether Pastor Jones was someone who might have sympathy for those who find themselves in a disadvantaged situation such as being charged with a crime and being on trial for that.

All of the things that the People pointed out about Pastor Jones, those things were pointed out about a prospective juror who was a white pastor and worked in all those situations and circumstances with a prosecutor exercise of a peremptory [sic]. Most people would understand the peremptory is being exercised because there was a pastor who worked with people who are underprivileged, who are down and out, however you want to put it, people that are faced with hard situations. And the pastor has sympathy towards those people, wants to help make their lives better. And no one would consider that the prosecutor is being unreasonable in removing a white pastor or and Asian pastor or Hispanic pastor who is in that situation.[14]

The Court's unable to say that because the pastor is black, you can't exercise a

---

[14] As the state appellate court noted, it appears that the trial court was speaking hypothetically regarding the exercise of a peremptory challenge against a Caucasian pastor as the record does not reflect that such a person was a prospective juror in Petitioner's case.

peremptory when you would be able to properly when the person is white under these circumstances.  And [the] People have stated rational reasonable nonprejudicial bas[e]s for exercising [a] peremptory [challenge] and the law requires the Court allow them to do so.  The motion is denied.

RT at 145-146.  On direct appeal, the California Court of Appeal, Third Appellate District, upheld

the trial court's rejection of Petitioner's *Wheeler-Batson* claim, explaining as follows:

A prosecutor's use of peremptory challenges to strike prospective jurors on the basis of racial bias violates the criminal defendant's rights to equal protection and to trial by a jury drawn from a representative cross-section of the community.  (*People v. Bell* (2007) 40 Cal.4th 582, 596, 54 Cal.Rptr.3d 453, 151 P.3d 292.) If the defendant makes a prima facie case of racial bias, the trial court asks the prosecution to explain its reasoning, and if a race-neutral explanation is tendered, the trial court must decide whether racial discrimination has been shown.  (*Ibid.*)

On appeal, we review the trial court's ruling under a substantial evidence standard, giving deference to the trial court's sincere and reasoned effort to evaluate the prosecutor's reasons.  (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1126, 124 Cal.Rptr.2d 373, 52 P.3d 572.)

Here, substantial evidence supports the trial court's decision that the prosecutor's reasons for excusing the pastor were legitimate and race-neutral.  The pastor is in the business of forgiveness, and the prosecutor was not required to accept the pastor's assurance that he could find someone guilty.

Defendant argues he was not homeless or underprivileged.  Defendant thus continues to miss the point. "Underprivileged" in this context was not limited to economic circumstances but included being on the defense side of a government prosecution.

Defendant cites authority that, although the exclusion of a single prospective juror may be the product of improper bias, as a practical matter the challenge of one or two jurors can rarely suggest a pattern of impermissible exclusion.  (*People v. Bell*, *supra*, 40 Cal.4th at p. 598, 54 Cal.Rptr.3d 453, 151 P.3d 292 [upheld trial court's determination that defendant failed to make prima facie case of discrimination].)  Defendant develops no argument based on *Bell*.

We conclude defendant fails to show grounds for reversal with respect to his *Batson/Wheeler* motion.

*People v. Semien*, 162 Cal.App.4th 701, 706-708 (2008).

60

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court held that the Equal Protection Clause prohibits a prosecutor from exercising peremptory challenges to strike a venire person on the basis of race. *People v. Wheeler*, 22 Cal.3d 148 (1978), is the California state counterpart to *Batson*. *Yee v. Duncan*, 463 F.3d 893, 896 (9th Cir. 2006). However, it is the standards of *Batson* that control the disposition of Petitioner's claim on federal habeas corpus review. *Lewis v. Lewis*, 321 F.3d 824, 827 (9th Cir. 2003).

In order to prevail on a *Batson* claim, a defendant must first establish a prima facie case of purposeful discrimination. *Batson*, 476 U.S. at 96-97; *Lewis*, 321 F.3d at 830; *United States v. DeGross*, 960 F.2d 1433, 1442 (9th Cir. 1992). "To establish a prima facie case, the defendant must show that 'he is a member of a cognizable racial group,' *Batson*, 476 U.S. at 96, and that 'the facts and circumstances of the case raise an inference' that the prosecution has excluded venire members from the petit jury on account of their race." *McClain v. Prunty*, 217 F.3d 1209, 1219-20 (9th Cir. 2000) (quoting *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000)). In deciding whether a defendant has made the requisite showing, the trial court should consider all relevant circumstances. *Batson*, 476 U.S. at 96.

If a prima facie case is made out, "the burden shifts to the State to come forward with a neutral explanation for challenging" the jurors in question. *Batson*, 476 U.S. at 97; *DeGross*, 960 F.2d at 1442; *Stubbs v. Gomez*, 189 F.3d 1099, 1104 (9th Cir. 1999). "The prosecutor's challenges need not rise to a level justifying use of a challenge for cause." *United States v. Power*, 881 F.2d 733, 740 (9th Cir. 1989) (citing *Batson*, 476 U.S. at 87-88). Indeed, for the purposes of this step, the prosecutor's explanation need not be "persuasive or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). Rather, a neutral explanation in this context "means an explanation based on something other than the race of the juror." *McClain*, 217 F.3d at 1220 (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991)). "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *McClain*, 217 F.3d at 1220 (quoting *Stubbs*, 189

F.3d at 1105).  As with any credibility determination, the trial court's own observations are of significant importance.  *Batson*, 476 U.S. at 98 n.21.  *See also Lewis*, 321 F.3d at 830.

At the final step of this inquiry, "the trial court must determine whether the defendant has carried the burden of proving purposeful discrimination."  *McClain*, 217 F.3d at 1220 (quoting *Hernandez*, 500 U.S. at 359).  *See also Batson*, 476 U.S. at 98.  The court must evaluate the prosecutor's reasons and make a credibility determination.  *Lewis,* 321 F.3d at 830.  A comparative analysis of the struck juror with empaneled jurors "is a well-established tool for exploring the possibility that facially race-neutral reasons are a pretext for discrimination."  *Lewis*, 321 F.3d at 830.  If a review of the record undermines the prosecutor's stated reasons, or many of the stated reasons, then the explanation may be deemed a pretext.  *Id*.  The proffer of various faulty reasons and only one or two otherwise adequate reasons may undermine the prosecutor's credibility to such an extant that a court should sustain a *Batson* challenge.  *Id*. at 831.

On the other hand, "[t]he fact that a prosecutor's reasons may be 'founded on nothing more than a trial lawyer's instincts about a prospective juror' does not diminish the scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's actions."  *Power*, 881 F.2d at 740 (quoting *United States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989)).  "Excluding jurors because of their profession, or because they were acquitted in a prior case, or because of a poor attitude in answer to voir dire questions is wholly within the prosecutor's prerogative."  *United States v. Thompson*, 827 F.2d 1254, 1260 (9th Cir. 1987).  "Evidence in the record of objective reasons to strike a juror implies that racial bias did not motivate the prosecutor."  *Boyd v. Newland*, 393 F.3d 1008, 1013 (9th Cir. 1987).

Petitioner bears the burden of demonstrating the existence of unlawful discrimination, *Batson*, 476 U.S. at 93, as this burden of persuasion "rests with, and never shifts from, the opponent of the strike."  *Purkett*, 514 U.S. at 768.  However, Petitioner "is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'"  *Batson*, 476 U.S. at 96 (quoting

1   *Avery v. Georgia*, 345 U.S. 559, 662 (1953)).

2           A state court's finding that a prosecutor has not exhibited discriminatory intent in

3   exercising peremptory challenges "represents a finding of fact of the sort accorded a great degree

4   of deference." *Hernandez*, 500 U.S. at 364.  Thus, in order for Petitioner to obtain habeas corpus

5   relief "[u]nder AEDPA, . . . a federal habeas court must find the state-court conclusion 'an

6   unreasonable determination of the facts in light of the evidence presented in the State court

7   proceeding." *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting 28 U.S.C. § 2254(d)).  "[A] federal

8   habeas court can only grant [habeas corpus relief] if it was unreasonable to credit the prosecutor's

9   race-neutral explanations for the *Batson* challenge."  *Id.*  In determining whether a state court's

10  application of law or factual determination is "unreasonable," the court cannot simply consider

11  whether it would have reached a different outcome on the same record.  *Id.*  ("Reasonable minds

12  reviewing the record might disagree about" what the ultimate issue is for habeas corpus relief.).

13  "The 'unreasonable application' clause requires the state court decision to be more than incorrect

14  or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  Only if the evidence is "too powerful

15  to conclude anything but" the contrary should the district court grant relief.  *Miller-El v. Dretke*, 545

16  U.S. 231, 265 (2005).

17          Under the authorities discussed above, the only issue for review in this case is

18  whether the state appellate court was unreasonable in determining that the prosecutor's stated race-

19  neutral reasons for excusing prospective juror Pastor Jones were genuine.  Here, the prosecutor

20  articulated several reasons for excusing Pastor Jones, including (1) his career as a pastor, which the

21  prosecutor described as a profession embracing the concepts of sympathy and forgiveness; (2) his

22  wife's profession as a clerk with the welfare department, and (3) his experience working with

23  individuals in some way disadvantaged by life circumstances.  These are permissible, non-

24  discriminatory reasons for exercising peremptory challenges falling within the well-settled rule that

25  both occupation and interest or experience in social service or similar fields are permissible, non-

26  discriminatory reasons for exercising peremptory challenges.  *See generally Hall v. Luebbers*, 341

F.3d 706, 713 (8th Cir. 2003) ("Occupation is a permissible reason to defend against a *Batson* challenge, and being a social worker could be a legitimate reason to strike a prospective juror."); *United States v. Smith*, 223 F.3d 554, 569 (7th Cir. 2000) (prosecutor's stated reason to strike a potential juror because she was "a social worker type" who would be "too sympathetic towards the defendants" was found non-racial); *United States v. Thompson*, 827 F.2d 1254, 1260 (9th Cir. 1987) ("Excluding jurors because of their profession . . . is wholly within the prosecutor's prerogative.").

Having reviewed the record, and in light of the governing deferential standard of review, the state appellate court's determination that the reasons given by the prosecutor for excusing Pastor Jones were not a pretext for racial discrimination cannot be found unreasonable. The stated reasons were "clear and reasonably specific," *Purkett*, 514 U.S. at 768-69, as well as race-neutral.

Petitioner is not entitled to federal habeas corpus relief on this claim.

## VI.  CONCLUSION

For all of the foregoing reasons, the petition should be denied.  Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  A certificate of appealability may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  For the reasons set forth in these findings and recommendations, a substantial showing of the denial of a constitutional right has not been made in this case.

Accordingly, IT IS HEREBY RECOMMENDED that:

1.    Petitioner's July 6, 2009 petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 be denied; and

2.    The District Court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time waives the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  Any reply to the objections shall be filed and served within seven days after service of the objections.

DATED: November 09, 2011

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE